T.C. Memo. 1998-347

UNITED STATES TAX COURT

DAVENPORT RECYCLING ASSOCIATES, SAM WINER,
TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12801-89.                    Filed September 30, 1998.

<u>Thomas C. Borders</u>, <u>Gail H. Morse</u>, and <u>Courtney N. Stillman</u>,
for participants.

<u>Mary P. Hamilton</u>, <u>William T. Hayes</u>, and <u>Howard A. Wiener</u>,
for respondent.

MEMORANDUM OPINION

DAWSON, <u>Judge</u>:  This case was assigned to Special Trial
Judge Norman H. Wolfe pursuant to the provisions of section
7443A(b)(4) and Rules 180, 181, and 183.[1]  The Court agrees with

---

[1]    All section references are to the Internal Revenue Code in
(continued...)

and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: The present case is part of the Plastics Recycling group of cases. The issues in this group of cases center about a six-step transaction involving the sale and lease of machines designed to recycle plastic scrap. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).

This matter is before the Court on participating partners Ernest C. and Marion K. Karras' (hereinafter participants) Motion for Special Leave to File Motion for Reconsideration of Decision or to Vacate Decision filed pursuant to Rules 161 and 162. Participants also lodged with the Court a Motion For Reconsideration of Decision or to Vacate Decision. As explained in greater detail below, we will deny participants' motion for special leave.

The issue for decision is whether grounds exist in this case for reopening or vacating what is otherwise a final decision. Participants allege that the Court lacked subject matter

---

[1](...continued)
effect for the tax years in issue, except as otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

jurisdiction to decide this case.  In particular, participants allege that Samuel L. Winer (Winer) had been enjoined from acting as tax matters partner (TMP) of Davenport Recycling Associates (Davenport) and had no authority to sign partnership level consents extending the statutory period of limitations for assessment during the relevant periods or to sign the petition to this Court on behalf of Davenport, and therefore this Court lacked jurisdiction when the decision was entered in this case. In addition, participants allege that the decision in this case was obtained as a result of fraud on the Court perpetrated by respondent because respondent's attorneys concealed from the Court Winer's purported inability to act as TMP.[2]

Respondent asserts that participants' motion for special leave should be denied because the Court had jurisdiction when the decision was entered, and the decision was not obtained by fraud on the Court.  Respondent further asserts that participants' motion for special leave should be denied because a timely petition was filed by the sole general partner, Winer, and it was ratified by the partners other than Winer.

---

[2]     In their Motion for Special Leave to File Motion for Reconsideration of Decision or to Vacate Decision, the participants assert that the Court lacks subject matter jurisdiction because they claim Winer did not have authority to extend the period of limitations or to file a petition in this Court.  The participants have not requested that, in the event the Court has jurisdiction, it should permit them to contest the underlying issues on the merits.

Davenport is a limited partnership subject to the unified partnership audit and litigation procedures set forth in sections 6221 through 6233, added to the Code by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648.

Respondent issued notices of beginning of administrative Proceeding (NBAP) to Davenport for the years 1982, 1983, 1984, and 1985 on September 11, 1984, November 8, 1984, January 29, 1987, and October 27, 1986, respectively. Copies of those NBAP's were issued to all notice partners of Davenport, including participants. On May 15, 1989, respondent issued notices of final partnership administrative adjustment (FPAA) to Davenport, proposing adjustments to Davenport's 1982 through 1985 years. The notices of FPAA were mailed to Winer as TMP, as well as to participants and all other notice partners for the 1982 through 1985 years of Davenport.

On June 9, 1989, a petition for readjustment for the years 1982 through 1985 was filed with this Court on behalf of Davenport by Winer, who identified himself as the TMP. When the petition was filed in this case, Davenport had its principal place of business in Clearwater, Florida, and participants resided in Oak Brook, Illinois.

This case subsequently was concluded before trial by a concession at the partnership level of the adjustments proposed by respondent. The case was conceded at the instruction of

Winer. On February 23, 1994, respondent's proposed decision was entered as the decision of the Court. Neither participants nor any other partner objected to the entry of decision, and no appeal was taken from the decision. Pursuant to sections 6230(a)(1) and 6231(a)(1) and (6), the deficiencies attributable to the disallowed Davenport partnership items were assessed by computational adjustments against Davenport's limited partners, including participants, at the conclusion of the partnership level proceedings.

Almost 2 years after the entry of decision in this case, on January 23, 1996, participants filed with this Court a Motion for Leave to File Election to Participate and submitted a Notice of Election to Participate in the captioned matter involving Davenport. By order dated February 15, 1996, we granted participants' motion to file a notice of election to participate in the captioned matter involving Davenport. Also on January 23, 1996, participants filed a Motion for Special Leave to File Motion for Reconsideration of Decision or to Vacate Decision in the captioned matter involving Davenport. On the same date participants lodged with the Court a Motion For Reconsideration of Decision or to Vacate Decision. Participants' motion for special leave is currently pending before this Court. The resolution of these matters turns on whether the petition to this Court signed by Winer on behalf of the partnership is valid for purposes of conferring jurisdiction on this Court and also on

whether the decision in this case was obtained as a result of fraud on the Court.

## Background

Because of the unusual circumstances of this case, we consider it appropriate to recount in some detail the events preceding Winer's filing of the petition.

## A.  The Plastics Recycling Transactions

The present case involves participants' investment in a limited partnership, Davenport, that purportedly leased Sentinel expanded polystyrene (EPS) recyclers.

The transactions involving the Sentinel EPS recyclers purportedly leased by Davenport are in substance the same as those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  Winer was the general partner of Clearwater. This Court has taken judicial notice of both the opinion and the record in the Provizer case, which is uniformly viewed as the lead case involving the Plastics Recycling transactions, and which held that those transactions were in substance a sham.

## B.  The Partnership

Participants were limited partners in Davenport, a New York limited partnership organized and promoted by Winer at the end of 1982.  Winer was the sole general partner of Davenport at all relevant times.

Under the Davenport agreement of limited partnership, Winer, as general partner, had full and exclusive power and authority on behalf of the partnership to manage, control, administer, and operate the business and affairs of the partnership. Winer's signature as general partner of Davenport was sufficient to bind the partnership. Winer signed Davenport's 1982 through 1985 partnership returns as general partner.

A Private Offering Memorandum (the offering) with respect to Davenport was distributed to potential limited partners. The Davenport offering states that Winer would have a 1-percent interest in all items of income, gain, deduction, loss, and credit arising from the operations of Davenport, for which he would pay $1,000. For the performance of his administrative and other services, including acting as the TMP of Davenport, Winer was to receive general partner fees in the amount of $62,000 from the proceeds of Davenport after the offering was closed to investors and additional compensation equal to certain sales commissions.

The Davenport offering projected tax benefits for a limited partner for 1982 from a $50,000 investment in the amount of $77,000 in investment and energy tax credits in addition to a $38,940 deduction. The offering required that investors who wished to purchase a $50,000 unit have either a net worth in excess of $1 million including residences and personal property, or income in each of the 2 most recent years in excess of

$200,000 and a reasonable expectation of income in the current year in excess of $200,000. Additionally, the Davenport offering stated that there was a high degree of risk with the offering. The offering declared that an investment in Davenport:

> should be considered only by persons who have a substantial net worth and substantial present and anticipated income and who can afford to lose all of their cash investment in the Partnership and to utilize or lose all or a substantial portion of the anticipated tax benefits flowing from such investment.

## C. Samuel L. Winer

In addition to being the general partner of Davenport, Winer was the general partner of Stevens, Hamilton, Masters, Dickinson, Pompano, and Whitman Recycling Associates. These were TEFRA partnerships which purported to lease Sentinel EPS recyclers and were substantially identical to Davenport. Also, Winer was the general partner of two non-TEFRA partnerships which purportedly leased Sentinel polyethylene (EPE) recyclers, Clearwater and Poly Reclamation Associates. Although Winer was involved in marketing the partnerships of which he was a general partner, he did not participate in structuring the Plastics Recycling transactions. Winer was also a part owner of two Sentinel recyclers.

Winer does not have an engineering background, and he is not an expert in plastics material or plastics recycling. The Davenport offering indicated that since 1977, Winer had been employed as an independent financial consultant and investment banker and that he had experience in the securities industry. Winer testified at the evidentiary hearing that in 1986 he was a

real estate developer and that he is currently employed as a real estate broker. Winer received a bachelor's degree in 1959 from Pennsylvania State University and attended St. Joseph's College and Temple University for advanced studies. Winer was identified in the Davenport offering as the TMP of Davenport.

Winer had been involved with other tax shelter transactions before he became a promoter of the Plastics Recycling partnerships. He had been a syndicator of numerous coal tax shelters. The record does not contain information regarding how Winer initially became a promoter of the Plastics Recycling partnerships.

D. Participants and Their Involvement With Davenport

Participant Ernest C. Karras (Karras) acquired a 5.50-percent interest in Davenport in 1982 for a capital contribution of $50,000. The Schedule K-1 attached to Davenport's 1982 return showed that Karras had a partnership loss from Davenport of $39,231, and a basis for investment tax credits and energy credits of $385,000. The record does not include copies of participants' Federal income tax returns.

Karras has a bachelor's degree in electrical engineering from the University of Illinois, has done postgraduate work in telecommunications and computer sciences, and has a master's degree in industrial management from DePaul University. At all times since 1982, Karras has been owner, president, and CEO of an

engineering and manufacturing company engaged in the production of high-tech computers for the telecommunications industry.

Karras received the initial solicitation for Davenport from his personal accountant of 20 years, Barry Swartz (Swartz), who recommended the Davenport investment. Karras testified that, when he invested in Davenport, he believed that plastics recycling had a good future. When Karras invested in Davenport, he knew that Winer was the general partner.

After reading the Davenport offering for the "basics", Karras gave the offering to his attorney, John Karones (Karones). According to Karras, after Karones reviewed the Davenport offering he said, "This is a pretty risky thing, plastic recycling", and questioned whether the recyclers described in the offering really existed. Karras testified that he then called his accountant, Swartz, for confirmation that the recyclers really existed. After a few days, Swartz reported back to Karras that someone that Swartz knew had seen the recyclers. Neither Karras nor Swartz actually saw any of the recycling machines before Karras paid $50,000 for his interest in Davenport.

During the proceedings in the underlying Davenport Recycling case, Karras became aware that Winer, as TMP, had filed a petition with this Court. Karras did not receive further information or updates from Winer regarding the status of the case after the filing of the petition. Karras claims that he did not learn that the case involving Davenport had been settled

until he "received a bill from the IRS." Karras testified that he "couldn't believe that the case was over with and nobody had told us anything." In the end, Karras was "bowled over" by the size of the tax liability that had resulted from his "simple $50,000 investment."

E. The Winer Section 7408 Injunction Proceeding

In 1984, Winer and Winer Development Corp. were identified by respondent as persons who had violated section 6700 by promoting or selling partnerships or other arrangements that included gross valuation overstatements. Subsequently, respondent issued prefiling notification letters to Winer and the notice partners of Davenport, including participants, regarding Davenport on April 14, 1984. These letters stated that the Internal Revenue Service (IRS) planned to review the 1982 and 1983 tax returns of each investor in Davenport for claimed tax deductions and credits resulting from an investment in the partnership, which had been identified as a tax shelter. The letters indicated that the IRS did not believe the purported tax deductions and/or credits were allowable and that if such tax deductions and/or credits had been claimed by the investor, his or her return would be audited. The investor also was provided an opportunity to file an amended return.

On April 13, 1984, respondent, through the Office of District Counsel in Jacksonville, authorized the U.S. Department of Justice (DOJ) to seek injunctions under section 7408 against

Winer and Winer Development Corp. for engaging in conduct subject to penalty under section 6700.  The letter from the district counsel stated in part:

> you are hereby authorized and requested to take whatever legal action you deem necessary to secure an injunction against * * * [Winer] to prevent him from further promoting, marketing, selling and/or servicing any abusive tax shelter scheme within the meaning of I.R.C. section 6700.

On August 17, 1984, the United States filed a complaint under section 7408 against Winer in connection with his promotion of certain Plastics Recycling partnerships, and later Winer Development Corp. was added as a defendant.  The proceeding was docketed as United States v. Winer, Civil No. 84-1123-CIV-T-13 (M.D. Fla.).  In the complaint, the United States sought to enjoin Winer and Winer Development Corp. from:

> (1) taking any action in furtherance of the organization or sale of any abusive tax shelter, including but not limited to the organization of and sale of interests in the abusive tax shelter plan entitled "Stevens Recycling Associates," and other similar abusive tax shelter plans; (2) engaging in any other conduct subject to penalty pursuant to Section 6700 of the Internal Revenue Code; and (3) from engaging in other similar conduct that substantially interferes with the proper administration of the Internal Revenue Laws.

Paragraph 28 of the complaint named seven other limited partnerships substantially identical to Stevens Recycling Associates in formation, operation, and purpose.  Davenport was included in the list of the seven limited partnerships.

Winer was represented during the initial stages of the section 7408 injunction proceeding by Elliot Miller (Miller).

Before becoming involved in the Plastics Recycling cases, Miller represented investors in coal mining partnerships that had been syndicated by Winer. Other attorneys, including Ronald Fieldstone (Fieldstone), represented Winer at various times during the section 7408 injunction proceeding.

The United States was represented at various times during the section 7408 injunction proceeding by DOJ Tax Division Trial Attorney Alice J. Davis (Davis) and many other attorneys on the staff at the DOJ.

Davis graduated from law school in 1979. She then worked for the IRS for 4-1/2 years before accepting a position with the Tax Division of the DOJ in Washington, D.C. During her employment with the IRS, Davis worked temporarily at the DOJ in the Special Litigation Section. The function of the Special Litigation Section was to bring injunction and penalty suits under sections 6700 and 7408 against persons who were believed to have promoted abusive tax shelters.[3]

During the evidentiary hearing, Davis could not recall how the Winer injunction case was assigned to her. Davis recalled that the Winer case was only one of many large cases assigned to

[3] The Special Litigation Section of the Department of Justice (DOJ), Tax Division, was created as a result of changes made to the Internal Revenue Code by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 648. TEFRA secs. 320(a) and 321(a), 96 Stat. 611, 612, added secs. 6700 and 7408, respectively.

her. Davis testified that she did not work with any other trial attorneys from the DOJ on the Winer injunction case.

Documentary evidence in this case indicates that the Winer section 7408 injunction case was assigned to respondent's Jacksonville District Counsel Office, and particularly to Attorney Avery Cousins III. There is no evidence that the Winer section 7408 injunction case was assigned to or handled by any of respondent's attorneys in the Boston District Counsel Office of the IRS. Winer never met with District Counsel Attorney Mary P. Hamilton (Hamilton) or William T. Hayes (Hayes) during the pendency of the section 7408 injunction case filed against him by the DOJ. Hamilton and Hayes appeared before this Court on behalf of respondent in this proceeding.

Although Davis worked with people at the IRS, primary responsibility for the Winer section 7408 injunction proceeding was with the DOJ and not the IRS. Davis testified that she believed that she was a key person in the litigation and that the litigation decisions for the case were made in her office. Davis was not able to recall exactly who she worked with at the IRS during the Winer section 7408 injunction case.

On May 10, 1985, before the Jacksonville Office of District Counsel requested approval from the DOJ to proceed with an assessment of section 6700 penalties against Winer. Approval was granted, provided the assessments were determined in a manner consistent with the litigating position taken by the DOJ in

another section 6700 penalty case in which Winer was not involved, which was being argued before the same judge presiding over the Winer section 7408 injunction proceeding. Davis later advised the Jacksonville District Counsel's Office that the DOJ had changed its position and did not approve of the amount of the proposed penalties.

In the fall of 1985, Winer and his attorneys determined that they wished to conclude the section 7408 injunction proceeding and explore the possibility of negotiating a settlement with the DOJ. Winer testified that he decided to settle the section 7408 injunction proceeding because he felt it was "detrimental to the partners" of the partnerships in which he was the general partner. Miller withdrew as Winer's lead counsel, and Fieldstone was engaged for "the specific and limited purpose of exploring and negotiating such a settlement" with the DOJ. Fieldstone's primary objective in any settlement with the Government was to prevent the Government from restricting Winer in his profession as a securities salesman. Fieldstone was not involved in any of the other Plastics Recycling cases. The arrangement was that if Winer and the DOJ were unable to reach an acceptable settlement, Miller would then return to represent Winer during the trial.

A settlement conference in the Winer section 7408 injunction proceeding was arranged for November 18, 1985, in Washington, D.C., at the DOJ. Before the conference, Davis forwarded to Fieldstone a copy of a draft Final Consent and Final Judgment of

Permanent Injunction (Permanent Injunction) for Fieldstone to review. Davis also sent copies of these documents to Miller.

No one other than Winer, Fieldstone, and Davis was present during the settlement conference, although Davis did leave the room at times to confer with her colleagues. The settlement was ultimately finalized on the same day. The only persons who participated in the actual settlement negotiations were Winer, Fieldstone, and Davis.

As part of the settlement, at the insistence of Davis, Winer agreed to resign as TMP of the Plastics Recycling partnerships named in the complaint, including Davenport. According to Winer, Davis "said that I can't have you promoting these things and you need to resign."

Davis knows of no other case in which the DOJ made an attempt to remove the TMP. According to Davis, at the time, the DOJ was concerned that Winer was continuing to make representations to the other partners in the Plastics Recycling partnerships that their deductions related to the partnerships were valid. Requiring Winer to resign as TMP was, among other things, an attempt by the DOJ to prevent him from continuing to make these representations.

Winer understood that the duties of a TMP were the same as those of a general partner. However, Winer never investigated the duties of a TMP. According to Fieldstone, Winer's resignation as TMP was not a crucial term of the negotiated

settlement with the DOJ.  Moreover, Fieldstone recalled that there was a fair amount of negotiation with the DOJ regarding the degree of constraint on Winer's continued participation in the securities business and what reporting obligations would be imposed upon Winer as part of the settlement.  In addition, Fieldstone recalled that "we were negotiating a letter to the limited partners and Mr. Winer's role as a tax adviser, those types of issues.  I don't remember the details."  It was Fieldstone's impression that the Government wanted Winer to resign as TMP, "maybe because he was one of the promoters of the transaction."  Although Fieldstone knew what a TMP did, he did not specifically analyze it for purposes of finalizing a settlement with the Government.  Fieldstone did not know how a TMP was appointed or changed, and he never did any research on the matter.

On January 3, 1986, Davis sent Fieldstone another draft of the proposed Permanent Injunction.  This document provided for an unspecified amount of penalties under section 6700 to be paid by Winer and Winer Development Corp.  This penalty provision was removed from the Permanent Injunction later entered by the U.S. District Court fro the Middle District of Florida (District Court).  A revised draft of the Final Consent was sent by Davis to Fieldstone on January 13, 1986.  The revised Final Consent had been changed to state that the entry of the Permanent Injunction did not preclude the IRS from assessing penalties under section

6700 or the defendants from contesting such penalties in the future.

The proposed Permanent Injunction was approved and signed by Fieldstone, and mailed to Davis on January 20, 1986. Fieldstone also sent a copy of the proposed Permanent Injunction to Miller. Winer signed the Final Consent on behalf of himself and Winer Development Corp. on January 27, 1986. In the Final Consent, Winer neither admitted nor denied the allegations in the complaint and consented to the entry of an order of permanent injunction.

Fieldstone did not consider the terms of the Permanent Injunction a total capitulation by Winer because, as the terms were set forth, the Permanent Injunction did not prevent Winer from being able to sell securities. Fieldstone believed he had accomplished his objective because Winer was able to settle his case with the Government and return to his career as a securities dealer.

The Permanent Injunction was entered by the District Court on February 18, 1986. In the Permanent Injunction, Winer and Winer Development Corp. (hereinafter Winer) were enjoined from promoting abusive Plastics Recycling tax shelter plans, including Davenport and other Plastics Recycling partnerships, within the meaning of sections 6700 and 6701. In general, Winer was enjoined from organizing, selling, or marketing tax shelter plans; making or furnishing oral or written advice to an investor

to the effect that the investor is entitled to tax benefits with respect to such tax shelter plans; or making or furnishing a statement as to the allowability of a tax benefit or as to the value of property or services related to the tax shelter plan. Winer was ordered not to contest in any court or administrative proceeding the denial of any tax credits or deductions claimed on his 1981 and 1982 individual Federal income tax returns, and any other tax years to which such tax credits and deductions may have been carried back or forward, with respect to the TEFRA Plastics Recycling partnerships. The Permanent Injunction further specifically states:

> Winer shall retain the right to be treated as a party in a proceeding brought by the tax matters partner of said partnerships as allowed by Sections 6226(c)(1) and 6228(a)(4)(A)(i) of the Internal Revenue Code, except that he will not actively participate in the action as allowed by Sections 6226(c)(2) and 6228(a)(4)(A)(ii). He shall, however, be allowed to cooperate with the tax matters partner for the purpose of administrative and court proceedings.

The February 18, 1986, Permanent Injunction ordered Winer to resign as TMP of the partnerships and to send a letter of resignation to all of the partners:

> It is further ORDERED, ADJUDGED AND DECREED that defendant Samuel L. Winer shall send a letter to each partner in the following partnerships:  * * * Davenport Recycling Associates * * * , within 30 days from the date this Order is entered.  In said letter, defendant Samuel L. Winer shall tender his resignation as tax matters partner (to the extent applicable) in said partnerships, and waive his right to intervene in any court proceedings as tax matters partner on behalf of these partnerships.  The form of the letter to be sent is attached hereto as Exhibit A.  Within 30 days from the date this Final Judgment order is entered, Samuel

L. Winer shall file an affidavit with this Court affirming that said letters have been sent.

In the letter from Winer, described in the above-mentioned exhibit A, Winer tendered his resignation as TMP of listed partnerships, including Davenport, and provided the name and address of a new TMP for each listed partnership. DL & Associates, Ltd. (DL & Associates), of Southfield, Michigan, was identified in the letter from Winer as the successor TMP for Davenport. In the required letter, Winer explained that he was complying with the requirements of the injunction without admitting or denying the allegations in the complaint.[4] The District Court did not order Winer to resign as general partner from any of the partnerships.

The Permanent Injunction did not enjoin Winer from providing correct factual information to the new TMP's for the partnerships or from providing such information in response to a court order,

---

[4]     The first paragraph of the letter stated as follows:

This letter is to advise you that effective _____, 1986, the undersigned individually and on behalf of Winer Development Corporation, entered into a Consent and agreed to a Final Judgment of Permanent Injunction, without admitting or denying any of the allegations in the Complaint, with respect to the pending action by the United States government for an injunction against the undersigned and Winer Development Corporation with respect to the Stevens Recycling Associates Partnership and other similar partnerships, including the partnership in which you are a limited partner.

The conclusion of the letter provided the names and phone numbers of Samuel L. Winer's attorneys, Elliot Miller and Ronald Fieldstone, and stated that they were available to answer any questions concerning the matters described in the letter.

subpoena, or as otherwise required by law.  Neither the DOJ nor the IRS (which was not a party to the case) was ordered by the District Court to make any notifications regarding any of the matters in the Permanent Injunction.

Winer's explanation for failing to communicate with the limited partners immediately after the Permanent Injunction was entered is that Fieldstone's receipt of a copy of the Permanent Injunction signed by the District Court judge was delayed.  On or about July 7, 1986, Winer filed an affidavit with the District Court, dated May 23, 1986, which indicated that he had sent the letters to the limited partners as specified in exhibit A of the Permanent Injunction.

Winer's letter of resignation to the partners stated in part:

> As also required by the Consent, the undersigned [Winer] hereby tenders his resignation as the tax matters partner of the partnership in which you are a limited partner.  The undersigned [Winer] has also personally waived his right to intervene in any court proceeding as tax matters partner on behalf of this and any other similarly situated partnership.  The new tax matters partner of your partnership is _____, whose address is _____, Telephone number _____.  Mr. ____, was appointed pursuant to section 6231(a)(7) of the Internal Revenue Code.

The letter instructed each addressee to consult an attached list of limited partners to determine who had been selected as the new TMP for his or her partnership.  However, no separate letters were sent to the individuals or entities who had been selected to replace Winer as the TMP of each partnership.  Winer testified

that he did not personally know each individual or entity named in his letter as a replacement TMP, but he did recognize two-thirds of the individuals or entities listed. At the time he sent the letter, Winer thought that DL & Associates, which he had identified as the replacement TMP for Davenport, was a law firm. In fact, DL & Associates was a partnership which had been formed for the purpose of investing in Davenport and other Plastics Recycling promotions. DL & Associates consisted of five or six individuals who had a percentage of an interest in one unit of Davenport.

Other investors, aside from those who purportedly had been appointed as the new TMP's, called Winer after receiving his resignation letter of April 23, 1986, to ask him about the effect of his letter. Winer responded by assuring the investors that his resignation as TMP did not mean that they were out on their own and that since many of the new TMP's that he had designated were attorneys, the partnerships would still be able to fight the IRS on the tax issues. Additionally, a few investors called Fieldstone and asked him general questions about Winer's letter.

The record in this case clearly indicates that Fieldstone and Winer selected the replacement TMP's. In a June 23, 1986, letter from Davis to Fieldstone relating to the section 7408 injunction case against Winer, Davis wrote:

> This is in response to your May 22, 1986, letter concerning the tax matters partners for the eight partnerships involved in the above-entitled case. As you are aware, we left to you and your client's

discretion the choosing of the new tax matters partners to replace Mr. Winer. You provided to us the list of the new tax matters partners which we accepted without question.

Additionally, the Memorandum in Support of Joint Motion for Permanent Injunction, filed August 11, 1986, in the District Court and signed by both Davis and Fieldstone, clearly states that Winer prepared the list of new tax matters partners for the partnerships involved.

Eventually, all of the persons or entities designated as replacement TMP's in Winer's resignation letter contacted Winer, directly or indirectly, and indicated that they refused to serve as TMP's. For example, Stuart Hershfield, who had been selected by Winer to serve as the new TMP for the Stevens Recycling Associates partnership, on April 30, 1986, wrote in a letter to Winer:

> I discovered with some alarm that I have been designated as the new tax matters partner to replace you. This designation is not acceptable under any circumstance. I ask that you forthwith communicate with the IRS or the parties with whom you entered a consent order advising them that I do not wish to be the tax matters partner and accordingly to replace me.

The evidence indicates that Davis was caught off guard by the refusal of the purported replacement TMP's for the partnerships to act as such. In a June 23, 1986, letter to Fieldstone, Davis wrote:

> I was quite surprised and somewhat dismayed to discover that at least some of the newly "appointed" tax matters partners had not agreed to the appointments, nor had they even been contacted before their names were submitted to us by you and your client. The

appointment of parties to be tax matters partners
without first obtaining their consent [indicates] a
clear lack of good faith in the consent negotiations.

In her letter, Davis concluded that because so many of the newly selected TMP's would not agree to their purported appointments, the United States would not object to the appointment of a second round of replacement TMP's, provided:

the tax matters partners to be appointed have consented
to such an appointment and are qualified to act in that
capacity, and further provided that the appointee not
be Samuel Winer.

## F.  DL & Associates

DL & Associates of Southfield, Michigan, had been selected by Winer and Fieldstone as the new TMP of Davenport.  DL & Associates acquired a 1.79-percent limited partner interest in Davenport in 1982 for a capital contribution of $16,250.  DL & Associates was named for David Lichtenstein (Lichtenstein), who was one of the partners.  Lichtenstein is an attorney who practices business and transactional law.  Lichtenstein testified that he became aware of the Davenport offering through Fred Gordon (Gordon), an attorney in Michigan.  In the Davenport offering, Gordon was identified as the special counsel to the general partner, who was Winer.  Gordon was later retained by Winer on behalf of Davenport for the TEFRA litigation in the subject case.  Lichtenstein was familiar with the litigation involving the Plastics Recycling partnerships because he had been a witness in the lead case, Provizer v. Commissioner, T.C. Memo.

1992-177, as well as another Plastics Recycling case tried in Detroit, Michigan, after the trial in <u>Provizer</u>.

Lichtenstein testified that neither he nor DL & Associates ever received a notice from the IRS or the DOJ that DL & Associates was being appointed as the new TMP for Davenport. Lichtenstein was never notified by Winer prior to his receipt of Winer's letter listing DL & Associates as the new TMP of Davenport. According to Lichtenstein, upon receipt of Winer's letter, he called Gordon and "told him what I had received and that I had no idea what it was, and that I had no idea how this partnership could act in any capacity to represent anything or anyone, and I asked him what should we do?" Gordon told Lichtenstein he would look into the matter and get back to him. There is no evidence in the record that Gordon ever responded to Lichtenstein's inquiry.

A few weeks before the evidentiary hearing in the present case, Lichtenstein received some document which the IRS had sent to DL & Associates, but Lichtenstein was unable to recall whether the documents had been addressed to DL & Associates as TMP of Davenport. Lichtenstein did not remember receiving an FPAA in the <u>Davenport Recycling</u> case and was unaware that in 1989, a petition had been filed on behalf of Davenport with this Court by Winer.

At the time of the evidentiary hearing in this case, Lichtenstein was unaware of the status of DL & Associates. Under

Michigan law, a partnership must be renewed after a certain period of time or it will expire.  Lichtenstein did not renew DL & Associates' status as a partnership.

G.  The Modified Injunction

Miller had received a copy of the February 1986 Final Consent and Permanent Injunction from Winer.  Sometime in late April or early May 1986, Miller read the proposed TEFRA partnership regulations which had been reprinted in the April 17, 1986, issue of the Daily Tax Report, a publication of the Bureau of National Affairs.  After reviewing the proposed TEFRA partnership regulations, Miller, on May 6, 1986, wrote to Winer regarding Winer's settlement of his section 7408 injunction case with the United States.  Miller also sent copies of this letter to Fieldstone and Davis.

In his letter, Miller informed Winer that he believed Winer's settlement of the section 7408 injunction proceeding action was invalid because:  (1) Winer had not resigned as TMP in accordance with the proposed TEFRA partnership regulations; and (2) only general partners could be designated as TMP's.  It was Miller's belief that certain provisions in the proposed regulations:

> confirm that what you did in the settlement process is probably invalid and, should the Proposed Regulations be promulgated in the form in which they are proposed, certain additional steps will have to be taken before your resignation as tax matters partner can be effective and before the successor tax matters partner can be properly designated.

I am enclosing herein section 301.6231(a)(7) of the proposed regulations. This makes clear that the only persons who may be designated as tax matters partners are persons who are general partners in the partnership. This is entirely consistent with the provisions of the Code which these Proposed Regulations purport to interpret. In fact, they do not contain any additional procedures pursuant to which a limited partner may become a tax matters partner.

Additionally, Miller's letter made clear to Winer that he believed Winer's resignation as TMP was ineffective under the proposed regulations because Winer had not filed a statement with the service center with which the partnerships' returns were filed. As Miller explained:

Moreover, the Regulations are quite clear that your status as a tax matters partner will remain in effect, notwithstanding a purported resignation and a purported designation of a successor, until the resignation and designation of a successor become effective; as noted, such resignation and designations would not become effective until filed with the service center.

* * * * * * *

Even so, such statements would not become effective retroactively, but only the day filed.

Miller further advised Winer to consult the partnership agreements to determine how to arrange for additional limited partners to become general partners so that they could serve as TMP's in accordance with the proposed regulations.

According to Miller, since Winer was still technically the TMP, he should comport himself in accordance with the proposed regulations until his resignation as TMP became effective. Miller also suggested that since Winer had sent letters to the investors stating that he had resigned as TMP, he should send the

investors a subsequent letter discussing the issues Miller had raised.

At some point after Miller sent his letter, Davis, Fieldstone, and Winer became concerned that because the partners Winer had listed as the new TMP's were all limited partners, they might be ineligible to serve as TMP's under section 6231(a)(7). The parties involved also were concerned by Miller's interpretation of the proposed regulations that the mailing of a letter of resignation by Winer to the partners was ineffective to terminate his own status as the TMP or to designate a new TMP under existing law.

In a June 23, 1986, letter to Davis, Fieldstone proposed that Winer "continue to serve as the tax matters partner solely for the purpose of providing administrative services in such capacity and not for the purpose of rendering any substantive legal advice to limited partners." Fieldstone also wrote that "Mr. Winer is willing to comply with your request to resign as tax matters partner if such resignation were possible under existing law, which apparently it is not."

In response, Davis, reversing her earlier opposition to allowing Winer to serve as TMP, wrote Fieldstone on August 7, 1986, that the United States would agree to allow Winer to continue to serve as TMP, for the purpose of providing "administrative services to the recycling partnerships." Subsequently, on August 11, 1986, the United States and Winer

filed a Joint Motion for an Order Granting Specific Relief from Final Judgment of Permanent Injunction (joint motion).  Winer authorized Fieldstone to sign the joint motion for specific relief on his behalf.  In the joint motion, the parties moved that "Winer be allowed to act as tax matters partner for some of the recycling partnerships listed in the Final Judgment of Permanent Injunction, for the purpose of providing administrative services to said partnerships."  Davenport was one of the recycling partnerships listed in the Permanent Injunction.  Winer purportedly assumed that the joint motion was another part of the settlement.

Davis testified that her understanding of the term "administrative services" at the time the modification was filed was that this would allow Winer to participate in winding up the partnerships and defending them in the Tax Court.  According to Davis, Winer was allowed to be reinstated as TMP because no other partner would accept the responsibility.

The parties also jointly filed a memorandum in support of the joint motion which stated:

> Because of the refusal of the persons on this list to act as tax matters partners, and the apparent inability of the defendant [Winer] to obtain other persons to act in this capacity, and also because someone is needed to administer the affairs of the partnerships, the United States and the defendants [Winer and Winer Development Corp.] have agreed that it is in the best interest of all involved to allow defendant Samuel L. Winer to act as tax matters partner on behalf of said partnerships.

Both the joint motion and the memorandum in support of the joint motion were drafted by Davis. The memorandum noted that the District Court had retained jurisdiction of the underlying injunction case for the purpose of implementing and enforcing any additional decrees and orders necessary and appropriate to the public interest. In the memorandum, the parties wrote that "an order allowing defendant Samuel L. Winer to act as tax matters partner for the * * * partnerships will serve the best interests of the public."

On September 17, 1986, the District Court issued an Order Granting Specific Relief from the Final Judgment of Permanent Injunction as to Samuel L. Winer and Winer Development Corp. in which it was ordered that "for good cause shown, * * * Samuel L. Winer may act as tax matters partner for the purpose of providing administrative services to the * * * partnerships", which included Davenport. The District Court's order did not remove the prohibitions against Winer's selling or promoting the partnership or intervening in any court proceeding as the TMP on behalf of any of the partnerships referenced in the February 18, 1986, Permanent Injunction.

Winer claims that he first heard of the proposal to reinstate him as TMP of the partnerships in August 1986 during a phone call from Fieldstone. Winer recalled that Fieldstone told him he had been reinstated because none of the other investors wanted to be the TMP. At that time of the modification, Winer

thought that because there was no activity going on at the partnership level, even after being reinstated as TMP, he still would not have any function. Winer testified at the evidentiary hearing in December 1996 that he understood "administrative services" to be "similar to a mailbox or a box drop. I mean, every time I got correspondence from the Government concerning audits or whatever, I would pass it on to the investors and also, they started sending me extensions."

Two months earlier, however, at a deposition on October 17, 1996, in the case of Thompson v. United States, 95-C-1112-B (N.D. Okla.), Winer testified that it was his understanding after the Permanent Injunction was modified "that if anything came up from a tax standpoint, that I was to step in--had been reappointed, whatever terminology you want to use--and do whatever I had to do." During the deposition, Winer stated that he believed he could also perform "ministerial functions", like cooperating with the investors "if they needed any help in terms of answering things relating to their taxes based on this investment."

Winer did not notify the investors after the order modifying the Permanent Injunction was entered by the District Court. Because of the large number of investors involved and the consequent expense, Winer was unwilling to incur the burden of notification if he was not required to do so by the District Court. Winer felt no obligation to notify all of the investors,

although he did inform a few investors "in the course of business" that he had been reinstated as TMP of the partnerships.

Winer did not speak with Davis about the modification and did not inform her that he was not going to notify the investors that he had been reinstated as TMP of the partnerships. Davis did not instruct Winer to notify the investors that the Permanent Injunction had been modified.

H. The Davenport Partnership Examination

Respondent conducted a TEFRA partnership audit of Davenport for its 1982 through 1985 taxable years. From 1984 through June 26, 1988, Winer was represented in the partnership audit proceedings by Harris W. Freedman, C.P.A. (Freedman), and Shaye Jacobson, C.P.A. (Jacobson), who were both also engaged by the Davenport partnership. Winer testified at the evidentiary hearing that he did not participate in the Davenport audit. During the entire audit, either Jacobson or Freedman or both of them handled the audit on behalf of Davenport as Davenport's attorneys in fact. Beginning on June 27, 1988, Winer and Davenport were represented by Gordon and/or Deborah Hack (Hack). Gordon testified at the evidentiary hearing at the request of respondent. Respondent also conducted TEFRA partnership audits of six additional Winer partnerships[5] for their 1982 through 1985 taxable years.

---

[5] The additional partnerships were: Dickinson, Hamilton, Masters, Pompano, Stevens, and Whitman Recycling Associates.

During the partnership audit proceedings, Winer signed Forms 872-P, Consent to Extend the Time to Assess Tax Attributable to Items of a Partnership (hereinafter the consents), to extend the period of limitations as TMP of Davenport under section 6229(b)(1)(B).[6]  According to Winer, he signed the consents in order to avoid immediate assessments' being made against the investors.  Every time Winer received a request to sign a consent to extend the statutory period of limitations he would call his attorney or Gordon for advice.  Winer stopped signing the consents in late 1988, after one of his attorneys told him to stop signing the consents in order to "wait and see what happens in Tax Court."

---

[6]    The dates of the extension forms signed by Winer were as follows:

### Taxable Year 1982

| Signed by Winer | Signed by IRS | Extension Date |
|---|---|---|
| 10/08/85 | 10/30/85 | 12/31/87 |
| 04/29/87 | 05/03/87 | 12/31/88 |
| 11/19/87 | 12/10/87 | 12/31/89 |

### Taxable Year 1983

| Signed by Winer | Signed by IRS | Extension Date |
|---|---|---|
| 08/26/86 | 09/22/86 | 12/31/87 |
| 04/29/87 | 05/03/87 | 12/31/88 |
| 11/19/87 | 12/10/87 | 12/31/89 |

### Taxable Year 1984

| Signed by Winer | Signed by IRS | Extension Date |
|---|---|---|
| 09/29/87 | 10/06/87 | 12/31/88 |
| 11/19/87 | 12/10/87 | 12/31/89 |

### Taxable Year 1985

| Signed by Winer | Signed by IRS | Extension Date |
|---|---|---|
| 11/01/88 | 11/03/88 | 12/31/89 |

Between 1986 and 1988, Revenue Agent Ray Ealy (Ealy) corresponded with Winer and/or Jacobson regarding the Davenport audit. Ealy addressed his correspondence to Winer as TMP of Davenport, and Winer identified himself as TMP in his dealings with Ealy. Winer testified that he believed the documents from the IRS were addressed to him as TMP because that was his "administrative function".

In November 1987, Ealy sent his summary report on the Davenport audit to Winer. Ealy's summary report disallowed the deductions and credits attributable to the Sentinel EPS recyclers on the primary ground that the recycler transactions were a sham and lacking in economic substance. Winer informed Ealy on November 26, 1987, that he did not agree with Ealy's summary report. A closing conference was scheduled for January 10, 1988, in order to give Winer time to contact the other partners. Winer disagreed with the IRS's appraisal report, which placed a value of $200,000, or $50,000 each, on the Sentinel EPS recyclers. On January 7, 1988, Winer informed Ealy that he had received no response from any of the partners, and therefore, there was no need for a closing conference. Winer told Ealy that as TMP he would prefer to proceed through the IRS Appeals process.

Respondent issued an examination report to Winer as TMP of Davenport on May 2, 1988. In the examination report, respondent disallowed all deductions and credits claimed with respect to

Davenport's recycling activity for the years 1982 through 1985. On May 2, 1988, copies of the cover letter accompanying the examination report, and the report itself were mailed to all other partners of Davenport, including participants. In response to respondent's examination report, Winer's attorney, Hack, filed a protest with the IRS on behalf of Winer in which Winer argued that Davenport was a for-profit venture and that the recyclers were not grossly overvalued. Winer did not allege that he was not the TMP or that he had been enjoined from serving as TMP.

I. The Plastics Recycling Project Settlement Offer

After the protest was filed, the Davenport Recycling case was assigned to IRS Appeals Officer Nelson Leduc (Leduc). In an October 21, 1988, letter from Leduc to Winer, respondent made the Plastics Recycling Project Settlement Offer to Davenport and the other TEFRA partnerships of which Winer was general partner. The settlement offer was mailed to Winer as TMP of Davenport at Davenport's business address and at Winer's home address. Leduc sent blank copies of the offer letter to Winer for his convenience, so that Winer could forward to each notice partner the details of the Government's offer. The terms of the settlement offer were as follows: (1) The investor would be allowed a deduction for 50 percent of his cash invested in the year of investment; (2) no business or energy tax credits would be allowed; (3) the investor would concede the overvaluation penalty under section 6659 at the 30-percent rate; (4) the

investor would concede the section 6621(c) interest; (5) the Government would concede the additions to tax for negligence under section 6653(a)(1) and (2); (6) the Government would concede the additions to tax for substantial understatement under section 6661; and (7) the investor had to execute a closing agreement.

Leduc's settlement offer letter stated that the offer would not be repeated and would be the best offer that would be made at any level of the IRS. Leduc's letter also mentioned that "this offer is identical for all investors within any entity identified as part of the Plastics Recycling Group." In addition, Leduc's letter clearly pointed out that the settlement offer would expire 30 days from the date stamped on the letter.

Winer did not recall receiving the offer letter from Leduc. According to Winer, if he had received the settlement offer, he would have forwarded it to Gordon.

Karras testified at the evidentiary hearing that he received a letter from Gordon regarding the settlement offer. Karras knew that Gordon was the attorney for Davenport. In his letter, Gordon advised participants that they should not accept the settlement offer from the IRS and that Gordon was going to continue to pursue the case.

Winer did not accept the settlement offer on behalf of any of the partnerships. Leduc closed the partnership cases as unagreed and recommended that FPAA's be issued.

J.  Proceedings Involving Winer's Tax Liabilities in His
Individual Capacity

On June 9, 1986, a penalty under section 6700 in the amount
of $534,600 was assessed against Winer by the Jacksonville,
Florida, IRS district director.  The notice of penalty charge
stated that the penalty for promoting an abusive tax shelter had
been assessed against Winer for organizing, assisting in the
organization of, or participating in the sale of an abusive tax
shelter.

Winer paid 15 percent of the section 6700 penalty
assessment, or $80,190, on or about July 7, 1986.  Thereafter, on
February 2, 1987, Winer filed a refund suit regarding the section
6700 penalty in the District Court for the Southern District of
Florida.  This suit was captioned Winer v. United States, Civil
Action No. 87-0175-CIV-RYSKAMP.  On April 2, 1987, Jacksonville
District Counsel wrote a defense letter to the DOJ, which was
handling the litigation of the section 6700 penalty case,
regarding Winer's suit.  Among other things, the defense letter
referred to the section 7408 injunction proceedings against Winer
and Winer Development Corp., but it raised no issues relating to
Winer's status as TMP of the Plastics Recycling partnerships
involved.  Although copies of the engineering reports showing the
overvaluation of the recyclers were forwarded to DOJ with the
defense letter, no copies of the pleadings from the Winer section
7408 injunction proceeding were included.  At the time, Davis

still had possession of the pleadings from the section 7408 injunction case against Winer and Winer Development Corp. This refund suit ultimately was dismissed without prejudice because venue was improper.

On June 21, 1988, Winer refiled his refund suit regarding the section 6700 penalty in the District Court for the Middle District of Florida. Winer's complaint contained no information or any references to the section 7408 injunction proceeding which had been filed against him by the United States.

In a case similar to Winer's, Waltman v. United States, 618 F. Supp. 718 (M.D. Fla. 1985), the District Court held that the amount of the penalty asserted under section 6700 was limited to the greater of $1,000 or 10 percent of the gross income derived from each sale. Id. at 720. Under the holding in Waltman, respondent's calculation of the section 6700 penalty in Winer's case was excessive and ultimately was reduced.

A notice of deficiency was issued to Winer and his wife, Judith J. Winer, on March 19, 1992. The notice of deficiency was for Winer's personal income taxes for the taxable years 1979 and 1981 through 1984, inclusive. In the notice of deficiency, respondent determined adjustments primarily related to Winer's investment as a Schedule C owner in certain Sentinel EPE and EPS recyclers. However, the notice of deficiency also made adjustments for "burnout gain" for Winer's mining partnerships, partnership losses claimed in excess of basis, and adjustments

due to prior examinations. Respondent also determined additions to tax for delinquency, negligence, overvaluation, and substantial understatement of tax.

Although Winer testified that he did not contest any of the adjustments in the notice of deficiency because "part of my settlement was that I wouldn't do that," on June 16, 1992, Winer's attorney, Richard Baron, filed a petition on behalf of Winer. The petition was docketed as Samuel L. Winer, Petitioner v. Commissioner of Internal Revenue, Respondent, docket No. 13308-92. In the petition, Winer set forth numerous arguments why respondent's adjustments were incorrect. Counsel for respondent in Winer's personal income tax case was Attorney Howard P. Levine (Levine) of respondent's Jacksonville District Counsel Office.

Winer's personal income tax case was concluded by a stipulated settlement between Winer and the Office of Miami District Counsel. A decision in the case was entered on May 23, 1994, which reflected deficiencies in tax and additions to tax in excess of $1,200,000, not including additions to tax for negligence under section 6653(a)(2) and additional interest under section 6621(c).

In December 1995, Winer filed for personal bankruptcy. At the evidentiary hearing, Winer implied that his concession and subsequent bankruptcy "[were] all part of a complicated scheme, if you will, or arrangement with the IRS," and that the

Government knew he would be filing for bankruptcy. However, during his deposition on October 17, 1996, in the case of Thompson v. United States, 95-C-1112-B (N.D. Okla.), Winer testified that the Government did not link the outcome of his personal tax case to any of the Plastics Recycling partnership cases.

## K. The Davenport Partnership Litigation

Both Winer and Davenport were represented during the Davenport TEFRA partnership litigation by Gordon at all times relevant hereto, and by Hack until her withdrawal in April 1991. Respondent was represented during the Davenport partnership litigation in this case by District Counsel Attorneys Mary P. Hamilton, Paul V. Colleran, and Kirk S. Chaberski and by Assistant District Counsel William T. Hayes.

After the issuance of the FPAA's in the Hamilton case, Winer wrote a memorandum to the partners of Hamilton, Davenport and Dickinson Recycling Associates, including Karras, on May 30, 1989. In his memorandum, Winer enclosed a copy of a Notice of Filing of Petition for Hamilton Recycling Associates and stated:

> Please be advised that we will do the same for
> Dickinson, Davenport, and any other partnerships that
> require this filing. We sincerely hope that you will
> continue to support our Legal Defense Fund so that we
> may continue to retain counsel to represent the
> partnership in order to obtain a favorable disposition
> of this matter.

On May 15, 1989, respondent issued notices of FPAA[7] to Davenport proposing adjustments to Davenport's 1982 through 1985 years.  In the FPAA's, respondent disallowed all deductions and credits attributable to the Sentinel EPS recyclers.  Copies of notices of FPAA issued to Davenport were mailed to all notice partners of Davenport, including participants.

When Winer received the notices of FPAA addressed to him as TMP of Davenport, he gave them to Gordon and his accountant. Subsequently, on June 9, 1989, Gordon filed a petition on behalf of Winer, in the subject case, captioned <u>Davenport Recycling Associates, Sam Winer, Tax Matters Partner v. Commissioner</u>, docket No. 12801-89.  Gordon's firm had been employed by Winer to file the petition with this Court, and Gordon was aware that the case caption read "Sam Winer, Tax Matters Partner".  At this stage in the case, Winer spoke frequently with Gordon, and Winer allegedly believes he told Gordon at some point prior to the filing of the petition that he was "back in" as the TMP of Davenport.

In his petition to this Court, filed June 9, 1989, Winer alleged:  "Petitioner is the Tax Matters Partner of the

---

[7]    The notices of FPAA were issued to the following addresses: (1) Mr. Samuel Winer, Tax Matters Partner, Davenport Recycling Associates, 3109 Crystal Cay, Bellair Beach, FL 33535; (2) Mr. Samuel Winer, Tax Matters Partner, Davenport Recycling Associates, P.O. Box 2929, Clearwater, FL 33517; and (3) Tax Matters Partner, Davenport Recycling Associates, P.O. Box 2929, Clearwater, FL 33517.

Partnership."  Winer had agreed to the filing of the petition, e.g., in Davenport Recycling and knew that the caption of the case identified him as the TMP.

During his testimony at the evidentiary hearing, Lichtenstein was unable to recall whether he or DL & Associates had received notices of FPAA regarding Davenport.  However, respondent's records indicate that the notices of FPAA were issued by certified mail to DL & Associates on May 15, 1989. Lichtenstein never filed a petition in the case involving Davenport.

In preparation for trial in the Davenport Recycling case, respondent conducted discovery, to which Gordon and Hack responded.  Respondent's primary interest during discovery was in records relating to the placement and production of the Sentinel EPS recyclers and "correspondence to and from the general partner and tax matters partner, Samuel L. Winer."  During the course of discovery, none of the discovery responses from Gordon and Hack contained any information regarding any section 7408 injunction proceedings involving Winer.

During the period of preparation for trial in the Davenport Recycling case, respondent prevailed on the merits in test litigation with respect to the Plastics Recycling issues.  The case of Harold M. Provizer and Joan Provizer, docket No. 27141- 86, was chosen as a test case and ultimately was the only test

case actually tried with respect to the underlying plastics recycling transaction.  As discussed previously, <u>Provizer</u>, resolved in T.C. Memo. 1992-177, has been uniformly viewed as the lead case involving Sentinel EPE recyclers.

During 1992 and 1993, respondent prepared four partnership cases as test cases (the SAB cases)[8] for the Sentinel EPS recycler.  On August 2, 1993, the day the trial of the SAB cases was scheduled to begin, the TMP of these partnerships conceded all partnership adjustments in full in open court.  As a result of the TMP's concessions, decisions were entered in favor of respondent in the SAB test cases.

After the complete concession by the TMP in the SAB cases, respondent wrote to Gordon on August 6, 1993, and inquired as to how Winer intended to proceed in his partnership cases.  Respondent's letter stated:  "Please advise this office by August 20, 1993, whether you will concede in full or try your cases in Tax Court.  If we do not hear from you by August 20, 1993, we will file motions to calendar your cases for trial."  Thereafter, on August 30, 1993, respondent filed a motion to

---

[8]    The cases involved were:  <u>SAB Recycling Associates 1982, SAB Management, Ltd., Tax Matters Partner v. Commissioner</u>, docket No. 4504-92; <u>SAB Recycling Associates 1983, SAB Management, Ltd., Tax Matters Partner v. Commissioner</u>, docket No. 4526-92; <u>SAB Foam Recycling Associates 1982, SAB Management, Ltd., Tax Matters Partner v. Commissioner</u>, docket No. 5103-92; and <u>SAB Foam Recycling Associates 1983, SAB Management, Ltd., Tax Matters Partner v. Commissioner</u>, docket No. 4826-92.

calendar in the <u>Davenport Recycling</u> case. In an order dated October 4, 1993, this Court set the <u>Davenport Recycling</u> case for trial in Detroit, Michigan, on March 7, 1994.

Sometime after the <u>Davenport Recycling</u> case was set for trial, Gordon advised respondent that Winer would concede all partnership level adjustments in <u>Davenport Recycling</u> and the other partnership cases, but that Winer could not certify that all of the other partners would also concede. The <u>Davenport Recycling</u> case was conceded at the direction of Winer. Gordon did not make any recommendations to Winer as to whether or not Winer should concede. During the evidentiary hearing, Gordon admitted that he did not send a copy of respondent's motion for entry of decision or proposed decision to Davenport's limited partners. Gordon also testified that he did not know whether Winer had sent copies of respondent's motion for entry of decision or proposed decision to Davenport's limited partners. However, Karras' testimony is that Winer never directly communicated to him that the IRS had filed a motion for entry of decision and a proposed decision in the <u>Davenport Recycling</u> case.

On November 5, 1993, respondent mailed to this Court a motion for entry of decision under Rule 248(b) and a proposed decision. On February 17, 1994, respondent's motion for entry of decision was granted. On February 23, 1994, respondent's proposed decision was entered as the decision of this Court. At

the conclusion of the partnership level proceeding, pursuant to sections 6230(a)(1) and 6231(a)(1) and (6), the deficiencies attributable to the disallowed Davenport partnership items were assessed against the partners, including participants. During the pendency of the Davenport partnership proceeding, none of the 39 notice partners of Davenport, including participants, ever moved to participate or intervene. No partner purporting to be a replacement TMP ever filed a petition on behalf of Davenport.

On May 26, 1995, more than 1 year after this Court had entered a final decision in the Davenport Recycling case, Hayes, of the Boston District Counsel Office, wrote a letter to the clerk of the District Court requesting copies of the orders entered in the Winer section 7408 injunction proceeding. Hayes indicated in his letter that he was requesting the information in order to respond to allegations made by taxpayers in a number of cases filed with this Court. On July 24, 1995, Hamilton, also of the Boston District Counsel Office, wrote to the clerk with a second request for copies of the orders.

On July 17, 1995, in a memorandum to the Jacksonville District Counsel Office, Hayes requested information regarding both the Winer section 7408 injunction case and the Winer section 6700 penalty case. Hayes wrote that his office needed Winer's old section 7408 and section 6700 files in connection with approximately 120 TEFRA penalties cases in which Winer was the

TMP.  Hayes also requested that any Jacksonville attorney who had worked on the Winer cases contact Hamilton.

In response to Hayes' memorandum, on August 3, 1995, Levine faxed Hamilton copies of:  (1) The Final Judgment of Permanent Injunction; (2) Winer's affidavit and Fieldstone's accompanying cover letter; (3) the Joint Motion for an Order Granting Specific Relief from Final Judgment of Permanent Injunction; (4) the Memorandum in Support of Joint Motion; (5) the Order Granting Specific Relief; and (6) a February 6, 1995, letter from James A. Strickland, C.P.A.  The facsimile transmission memorandum and Strickland letter indicated that the documents from the Winer section 7408 injunction proceeding had been submitted to the IRS Problem Resolution Office in Jacksonville, Florida, in February 1995.  Before Hamilton's receipt of these documents in August 1995, the Boston Office of District Counsel was unaware that in response to the joint motion, the District Court initially had removed Winer as TMP of Davenport in February 1986 and then purportedly reinstated him as TMP "for the purpose of providing administrative services" in September 1986.

### Discussion

We must decide whether grounds exist in this case to grant participants' motion under Rules 161 and 162 for special leave to file a motion to reconsider or vacate what is otherwise a final decision of this Court.  Participants argue that their motion

should be granted because this Court never had jurisdiction over the underlying case since Winer was not authorized to file a petition with this Court. Participants further contend that fraud was committed upon this Court by respondent. Additionally, they argue that the notices of FPAA were not timely. Participants' motion is based upon their wish to have this Court vacate the underlying decision so they no longer will be responsible for amounts that have been assessed against them by respondent. In response, respondent argues that Winer was the proper TMP of Davenport with authority to file the petition with this Court, and, in the alternative, that participants' motion should be denied because a timely petition was filed by Winer as notice partner and ratified by the other partners of Davenport. Additionally, respondent strongly denies committing fraud upon this Court. Respondent points out that participants' arguments concerning the alleged expiration of the statutory period for assessment are not relevant since those arguments involve an affirmative defense that was not raised timely and do not affect this Court's jurisdiction.

The date of a decision of this Court is the date an order specifying the amount of the deficiencies is entered in the records of the Tax Court, here February 23, 1994. Sec. 7459(c). A decision of this Court becomes final upon expiration of the time to file the notice of appeal if no notice of appeal is

filed. Sec. 7481(a)(1). Generally, a notice of appeal must be filed within 90 days after the decision is entered by this Court. Sec. 7483; Fed. R. App. P. 13(a). Therefore, the decision in this case became final on May 24, 1994. Participants' motion in this case was not filed until January 23, 1996.

Because the decision in this case was entered pursuant to a stipulated settlement with respondent by Winer, as the purported TMP, there is no underlying opinion for this Court to reconsider. Therefore, participants are not within the general rules for reconsideration of an opinion under Rule 161, and their motion for reconsideration is denied.

Once a decision becomes final, this Court may vacate the final decision only in certain narrowly circumscribed situations. The Court may vacate a final decision if that decision is shown to be void or a legal nullity for lack of jurisdiction over either the subject matter or a party. Billingsley v. Commissioner, 868 F.2d 1081 (9th Cir. 1989); Abeles v. Commissioner, 90 T.C. 103, 105-106 (1988); Brannon's of Shawnee, Inc. v. Commissioner, 69 T.C. 999, 1002 (1978). The Court may also vacate a final decision if there has been a fraud on the Court. Abatti v. Commissioner, 859 F.2d 115 (9th Cir. 1988), affg. 86 T.C. 1319 (1986); Senate Realty Corp. v. Commissioner, 511 F.2d 929, 931 (2d Cir. 1975).

Participants filed their motion approximately 20 months after the decision became final.  As we have noted, participants argue that their motion to vacate should be granted because the Court did not have jurisdiction over the underlying case and also because there was a fraud upon the Court.  A party seeking to vacate a final decision bears the burden of proof.  Abeles v. Commissioner, supra at 106.

In this case, participants also allege that the FPAA's were not timely issued since under the terms of the Permanent Injunction and subsequent Modification Winer was not authorized to execute consents extending the period of limitations because his authority as TMP was restricted to the performance of "administrative services".  However, we decline to address participants' allegations that the consents executed by Winer, as TMP, were ineffective to extend the time for respondent to issue an FPAA because allegations concerning the period of limitations constitute an affirmative defense, not a plea to the jurisdiction of this Court.  Rule 39; Genesis Oil & Gas, Ltd. v. Commissioner, 93 T.C. 562 (1989).  The timeliness of the FPAA is not relevant to the jurisdiction of this Court under section 6226, concerning judicial review of final partnership administrative actions.  Genesis Oil & Gas, Ltd. v. Commissioner, supra.  For the purpose of deciding participants' motion, our focus is on the validity of the petition and not upon the timeliness of the FPAA's.

In the instant case there was no trial; no evidence was adduced; no stipulations were filed in the record; and the stipulated decision does not recite any factual or legal bases upon which the deficiency was settled. The compromise and settlement of tax cases are governed by general principles of contract law. Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436, supplemented by 53 T.C. 275 (1969); Brink v. Commissioner, 39 T.C. 602, 606 (1962), affd. 328 F.2d 622 (6th Cir. 1964). Where a decision is entered pursuant to a stipulated settlement, the parties are generally held to their agreement without regard to whether the decision is correct on the merits. Stamm Intl. Corp. v. Commissioner, 90 T.C. 315, 321-322 (1988); Spector v. Commissioner, 42 T.C. 110 (1964). Within this framework, participants ask for leave to file their motion to vacate.

## Lack of Subject Matter Jurisdiction

This Court has jurisdiction to vacate a decision that has become final if we find that we lacked jurisdiction when we entered the decision. Pyo v. Commissioner, 83 T.C. 626, 632 (1984); Brannon's of Shawnee, Inc. v. Commissioner, supra at 1002. The Tax Court is a court of limited jurisdiction and may exercise jurisdiction only to the extent expressly permitted by statute. See sec. 7442; Trost v. Commissioner, 95 T.C. 560, 565 (1990).

Section 6226(f) vests this Court with subject matter jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the FPAA relates and the proper allocation of those items among the partners. Our jurisdiction over a partnership action is predicated upon the mailing of an FPAA by the Commissioner to the TMP and the timely filing by the TMP or other eligible partner of a petition seeking readjustment of partnership items. Secs. 6223(a)(2), 6226(a) and (b); Rule 240(c); Seneca, Ltd. v. Commissioner, 92 T.C. 363, 365 (1989), affd. without published opinion 899 F.2d 1225 (9th Cir. 1990).

Once a taxpayer invokes the Court's jurisdiction, jurisdiction lies with the Court and remains unimpaired until the Court has decided the controversy. Naftel v. Commissioner, 85 T.C. 527, 529-530 (1985).

The TMP may file a petition for readjustment with this Court within 90 days after the Commissioner mails the FPAA to that partner. Sec. 6226(a). When the TMP does not file a petition within the 90-day period, a "notice partner" or 5-percent group may file a petition for readjustment with this Court within 60 days after the close of the 90-day period. Sec. 6226(b)(1). "These time limits are jurisdictional and, if a petition is untimely, it must be dismissed." Tempest Associates, Ltd. v. Commissioner, 94 T.C. 794, 798 (1990).

The TMP of a partnership is defined in section 6231(a)(7) as follows:

> (7) Tax Matters Partner.--The tax matters partner of any partnership is--
>
> (A) the general partner designated as the tax matters partner as provided in regulations, or
>
> (B) if there is no general partner who has been so designated, the general partner having the largest profits interest in the partnership at the close of the taxable year involved * * *.
>
> If there is no general partner designated under subparagraph (A) and the Secretary determines that it is impracticable to apply subparagraph (B), the partner selected by the Secretary shall be treated as the tax matters partner.

A petition filed during the 90-day period by a partner other than the TMP is an invalid petition. Amesbury Apartments, Ltd. v. Commissioner, 95 T.C. 227 (1990); Computer Programs Lambda, Ltd. v. Commissioner, 89 T.C. 198, 205 (1987). In this case, because of the existence of the Permanent Injunction, and subsequent Modification, at the time he filed the petition, Winer was the TMP of Davenport, but he had been ordered to limit his function to "administrative services" on behalf of the partnership.

Under normal circumstances, this Court lacks jurisdiction to consider a petition filed by a person who is not authorized to file the petition. In 1983 Western Reserve Oil & Gas Co. v. Commissioner, 95 T.C. 51 (1990), affd. without published opinion 995 F.2d 235 (9th Cir. 1993), the U.S. District Court for the Central District of California had appointed a receiver pendente

lite for two limited partnerships purportedly authorized to perform the duties of a TMP in proceedings before the IRS or other tax or administrative agency. We held that the receiver was not a partner and thus could not meet the statutory requirement that the TMP be a partner. The receiver was not qualified to file a petition in this Court because he was not a TMP and also because the receiver's authorization to act in administrative proceedings did not authorize him to act before this Court. Id. at 62-63. Although Winer's ability to act as TMP was limited to the performance of "administrative services", at the time Winer filed the petition in this Court he was the sole general partner of Davenport and thus met the statutory requirement that the TMP be a partner. Therefore, by the terms of the controlling statute, Winer was not prohibited from filing a petition with this Court.

In this case, respondent mailed FPAA's to Winer as TMP of Davenport at two separate addresses, in addition to mailing an FPAA simply to Davenport's TMP, without identifying Winer as such. Furthermore, copies of the FPAA's issued to Davenport were mailed to all notice partners of Davenport, including participants. No argument was made by participants that there was no notice or inadequate notice. Instead, participants argue that respondent, by mailing duplicate notices of FPAA's to Winer, as TMP of Davenport, created the circumstances in the instant

case which allowed Winer to exceed his limited authority as TMP and file an unauthorized and therefore invalid petition. Participants further allege that respondent committed fraud upon the Court by sending Winer the FPAA because respondent knew that Winer had been enjoined from acting as TMP in the litigation of this case.

In Mishawaka Properties Co. v. Commissioner, 100 T.C. 353 (1993), we held that the principles of implied ratification apply in TEFRA partnership cases. That case involved a TEFRA real estate partnership, Mishawaka Properties Co. (Mishawaka), which had no designated TMP. Mishawaka was one of a group of related partnerships, both TEFRA and non-TEFRA, of which Sol Finkelman (Finkelman) was managing partner. Although Finkelman was a partner, he was not the partner with the largest profits interest.

During a period of more than 10 years, except for litigation counsel retained by Finkelman, Finkelman was the only partner or person who dealt with the Commissioner's agents, appeals officers, and counsel in connection with the audit of about 35 of the partnerships, some of which were later litigated as test cases. Id. at 355. The dispute involving Mishawaka was not settled, and litigation ensued.

Because there was a question regarding the identity of Mishawaka's TMP, the Commissioner issued triplicate FPAA's to Sol

Finkelman, Edmond A. Malouf (Malouf), and Mishawaka. Malouf was the partner with the largest profits interest. Finkelman, who was not the TMP, filed a petition within the 90 days reserved for filing a petition by the TMP. In the petition, Finkelman identified himself as the TMP. In addition, before the filing of the petition, Finkelman had prepared and signed all the partnership returns and acted as Mishawaka's managing partner and accountant. Finkelman had identified himself as the TMP in his correspondence with the other partners and advised them that he would be filing a petition in this Court on their behalf. Id. at 356-358.

One year after he had filed the petition, Finkelman notified the other partners that he could no longer finance the litigation and advised them to form committees to finance and organize the litigation. No partner took any action to disavow, repudiate, or manifest objection to Finkelman's filing of the petition, until 4 years afterward when a participant moved to dismiss the case for lack of jurisdiction on the grounds that Finkelman was not the proper TMP. Id. at 358-359.

In Mishawaka, we denied participant's motion to dismiss for lack of jurisdiction and held that we had jurisdiction over the case. We reached this holding by finding that the doctrine of ratification, which applied in deficiency cases, Kraasch v. Commissioner, 70 T.C. 623 (1978), applied in TEFRA cases as well

where State law is consistent with the principle of implied ratification. New York's partnership law, the law governing the Davenport partnership agreement, specifically indicates that the law of agency applies to partnerships. N.Y. Partnership Law sec. 4 (McKinney 1988). Inasmuch as ratification[9] is an agency concept, it applies here. Under New York law, ratification by implication may be found to exist where a principal fails to disaffirm the action of an agent within a reasonable time. IBJ Schroder Bank & Trust Co. v. Resolution Trust Corporation, 26 F.3d 370, 375 (2d Cir. 1994).

Moreover, in Mishawaka, we found evidence that persons who were qualified to file the petition had authorized or consented to the filing of the petition by Finkelman. Under the doctrine of ratification, such a petition was an imperfect petition which was then impliedly ratified by the other partners when they failed to protest Finkelman's filing of the petition. In earlier cases, we had allowed partners to perfect an imperfect petition in a TEFRA case where there was evidence that the partners had authorized the filing of the petition and wanted this Court to find jurisdiction. Montana Sapphire Associates. Ltd. v.

---

[9] A ratification occurs when the benefits of the purportedly unauthorized acts are accepted with full knowledge of the facts under circumstances demonstrating an intent to adopt the unauthorized arrangement. In re Securities Group, 926 F.2d 1051, 1055 (11th Cir. 1991) (citing Monarch Ins. Co. v. Insurance Corp. of Ireland, Ltd., 835 F.2d 32, 36 (2d Cir. 1987)).

Commissioner, 95 T.C. 477 (1990). However, in Mishawaka Properties Co. v. Commissioner, supra at 363, the Court explicitly noted that the partners were "seek[ing] refuge behind the fact that Finkelman may not have been the TMP when the petition was filed. * * * because they believe the period for assessment [had] expired. * * * [and] do not now wish to ratify, adopt, sanction, or in any way breathe life into the Finkelman petition."

Despite the Mishawaka partners' later attempts to disavow the petition filed by Finkelman, we found that ratification of the petition was implied on the basis of the partners' conduct after the filing of the petition, even though none of the partners had expressly ratified the petition. The partners in Mishawaka were aware that Finkelman had represented them before the IRS, both individually and as a group (partnership), on all business and tax matters involving Mishawaka. Additionally, the partners knew about the FPAA's and that Finkelman had filed a petition or was acting on their behalf in connection with the IRS. Id. at 366. The Commissioner had treated the petition as precluding assessment of deficiencies against the partners until the partnership proceeding was concluded. We found that the partners had relied on Finkelman "both before and after the filing of the petition under consideration and did not question his authority until * * * it became advantageous to do so. The

partners here voluntarily permitted Finkelman's petition and apparent authority to exist, a situation that should not redound to their own benefit and to respondent's detriment." Id. at 367.

Participants in the instant case are in a situation similar to that of the partners in Mishawaka. During the Davenport audit and subsequent proceedings, Winer was the only partner or person who dealt regularly with respondent's agents, appeals officers, and counsel, except for Gordon and Hack, who were chosen by Winer as litigation counsel, and the accountants also chosen by Winer. At all relevant times, Winer retained his position as the sole general partner of Davenport.

Both Winer and his attorney, Gordon, held Winer out to respondent as TMP. Respondent sent notices of FPAA's to Winer and all of the notice partners of Davenport, including participants and DL & Associates. When the petition was filed in this case, Winer identified himself as the TMP of Davenport. As in Mishawaka, respondent treated the petition filed by Winer as precluding assessment of deficiencies against the partners until the partnership proceeding was concluded. In addition, before the filing of the petition, Winer had signed all of the partnership returns as general partner.

Winer chose accountants to handle the partnership audit and hired attorneys to handle the partnership litigation. Winer provided the investors with: (1) Tax information for the purposes of filing returns; (2) status reports regarding the

Davenport recycling machines; (3) information regarding the original injunction proceedings involving PI; (4) <u>particularly</u> notice that a petition had been filed in the <u>Davenport Recycling</u> case and other partnership cases; and (5) progress reports regarding the <u>Provizer</u> trial and appeal. Participants and the other limited partners received this information from Winer and were aware that he was taking charge of the <u>Davenport Recycling</u> litigation. Participants did not question his authority as TMP until after they were assessed by respondent. "'Deficiencies ex post do not detract from authority ex ante.'" <u>DiSanza v. Commissioner</u>, T.C. Memo. 1993-142 (quoting <u>Slavin v. Commissioner</u>, 932 F.2d 598, 601 (7th Cir. 1991), revg. and remanding T.C. Memo. 1990-44), affd. without published opinion, 9 F.3d 1538 (2d Cir. 1993). In addition, Winer assisted Gordon and Hack by providing information to them so they could respond to respondent's discovery requests.

The evidence clearly indicates that all the limited partners, including Karras, were aware that Winer had filed a petition in this Court and intended to represent the limited partners in the subsequent litigation. During the evidentiary hearing on this matter, Karras testified that he received the FPAA's in time to file a petition in this Court but chose not to because he knew that Winer had filed a petition in this case. Furthermore, Karras had received a notice that Winer had filed a petition on behalf of Davenport in the capacity of TMP.

Consequently, we conclude that Karras and the other limited partners ratified Winer's filing of the petition.  We have held that a taxpayer can ratify a previously filed imperfect petition, even in the absence of express approval, through action or inaction implicitly approving the filing of the petition. Mishawaka Properties v. Commissioner, 100 T.C. 353 (1993); Kraasch v. Commissioner, 70 T.C. 623 (1978).

Participants attempted to disavow the validity of the petition only after they thought the period of limitations on assessment had expired.  However, as we stated in Lyon v. Commissioner, T.C. Memo. 1994-351:  "It was petitioner's duty to repudiate the * * * [petition] as soon as he learned of it if he had not authorized it."  Therefore, by waiting until 1996 to repudiate the petition that Karras knew Winer had filed in 1989, Karras impliedly ratified it.  Karras "had the duty and [was] in a position to disaffirm any unauthorized acts * * * long before filing * * * [the] motion now before the Court."  Kraasch v. Commissioner, supra at 628.

Not until 1996, long after the decision in this case became final, did any partner in Davenport take any action to disavow, repudiate, or manifest objection to Winer's filing of the petition.  We note that, at a minimum, many of Davenport's partners had reason to question Winer's authority to file the petition, because prior to their receipt of the May 30, 1989, memorandum from Winer regarding the Hamilton case, their last

official correspondence from Winer had been notification that he had been ordered by the District Court to resign as TMP of the partnerships and waive his right to participate in any court proceedings. Winer ultimately settled this case with respondent and failed to inform the other partners. Karras testified that he did not learn that the case had been settled until he was assessed by respondent for his share of the partnership deficiency. However, Karras offered no reasonable explanation why he did not take steps to keep himself informed of the status of the case, or why he did not make any inquiries of Winer when he received no further information. Although Karras is not an attorney, he is a sophisticated businessman with experience dealing with complicated matters. We note that he employed a C.P.A. who appeared as a witness in other plastics recycling litigation and had some contact with Plastics Recycling partnerships other than Davenport. It seems reasonable to us that an individual who is aware that he has a financial stake in the outcome of any litigation in this Court would take whatever steps were necessary to keep himself informed. The same would hold true for the other partners of Davenport, which we have noted required an investment of $50,000 per unit. In any event, Winer's failure to notify the limited partners of his decision to enter into a settlement with respondent does not justify the extraordinary relief of vacating the final decision in this case. Winer's failure to act was directed to the limited partners, and

not the Court, and does not affect our jurisdiction.  See sec. 6230(f).

Fraud on the Court

In the alternative, participants argue that respondent's attorneys, Hamilton and Hayes, committed fraud on the Court because they continued to deal with Winer as TMP of Davenport despite their knowledge of the contents of the Permanent Injunction and Modification.  In their briefs and during the evidentiary hearing on this matter, participants made very specific and accusatory statements concerning the actions and behavior of Hamilton and Hayes in this case.  However, after a full evidentiary hearing and full briefing of this issue by both parties, we find that there is no evidence that Hamilton or Hayes committed any fraud on the Court.  We further specifically find that Hamilton and Hayes had no knowledge of the terms or outcome of the section 7408 injunction proceeding against Winer before the decision in this case was entered.

We defined "fraud on the court" in Abatti v. Commissioner, 86 T.C. at 1325, as follows:

> Fraud on the court is "only that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjud[g]ing cases that are presented for adjudication.  Fraud, inter partes, without more, should not be a fraud upon the court." Toscano v. Commissioner, 441 F.2d at 933, quoting 7 J. Moore, Federal Practice, par. 60.33 (2d ed. 1970).  To prove such fraud, the petitioners must show that an intentional plan of deception designed to improperly

> influence the Court in its decision has had such an
> effect on the Court.   * * *

The burden is on the moving party to show such fraud by clear and
convincing evidence.  Drobny v. Commissioner, 113 F.3d 670 (7th
Cir. 1997), affg. T.C. Memo. 1995-209; Kraasch v. Commissioner,
supra at 626.

In the instant case, participants' allegation of fraud upon
the Court is based on evidence that respondent's Jacksonville
District Counsel Office signed and filed the answer in the
Davenport Recycling case, acknowledging Winer as TMP, although
the same office had initiated the section 7408 injunction
proceeding which resulted in Winer's being ordered to resign as
TMP by the District Court.  According to participants, it then
follows that Hamilton and Hayes, of respondent's Boston District
Counsel Office, knew that Winer had been enjoined from acting as
TMP of Davenport yet continued to deal with him as such in order
to achieve a favorable outcome in the Davenport Recycling case
for respondent.  Therefore, according to participants, the
conclusion of this case by a stipulated settlement between
respondent and Winer, acting as TMP of Davenport, was a fraud on
the Court.

In the instant case, participants in alleging that Hamilton
and Hayes committed fraud on the Court ignore the fact that,
through his actions, Winer himself advised the Court that he was
the TMP of Davenport.  For example, Winer signed Forms 2848

naming Gordon and Hack as attorneys for Davenport in his capacity as TMP, submitted a protest in the Davenport Recycling case identifying himself as the TMP, and in informal discussions with respondent's agents held himself out as the TMP of Davenport. Furthermore, the Modification did reinstate Winer as TMP, albeit with restrictions on the scope of his authority.

On the basis of our review of the evidence, we find that participants' allegations of fraud on the Court are groundless. Participants have failed to show that Hamilton and Hayes had actual or imputed knowledge of the content of the Permanent Injunction and Modification either before or during the Davenport Recycling litigation. Hamilton and Hayes both filed detailed affidavits with this Court stating that they had no knowledge of the "Winer TMP" issue prior to May 24, 1994, the date the decision in this case became final. We have no reason to disbelieve their assertions that they did not know about the existence of the Permanent Injunction and Modification until the spring of 1995 when a petition was filed in a Plastics Recycling TEFRA penalties case captioned David E. and Jean H. Kohn v. Commissioner, docket No. 5390-95.

On the basis of this record, we hold that respondent did not commit fraud on the Court. There is no evidence that Hamilton and Hayes had any involvement in the Winer section 7408 injunction proceeding. The letter authorizing the DOJ to seek injunctive action against Winer under section 7408 originated in

the Jacksonville District Counsel Office and was signed by the District Counsel there.  Participants did not call the District Counsel or any other member of the Jacksonville District Counsel Office to testify regarding any possible communications with Hamilton and Hayes which would have alerted them to the existence of the Permanent Injunction and Modification.

Because we have concluded that a petition conferring jurisdiction on this Court was filed and that there has been no fraud on this Court in this case, it follows that participants' Motion for Special Leave to File Motion for Reconsideration of Decision or to Vacate Decision will be denied.

<u>An appropriate order will</u>
<u>be issued</u>.