MISHAWAKA PROPERTIES CO., EDMOND A. MALOUF, SR., TAX MATTERS PARTNER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13384–88.           Filed April 13, 1993.

*Mark A. Golding,* for petitioner.
*Ronald M. Rosen,* for respondent.

OPINION

GERBER, *Judge:* This present controversy was initiated by a participating partner's [1] motion to dismiss for lack of jurisdiction. The petition was filed within the 90-day period of section 6226(a) [2] by a partner-promoter of a general partnership who was not the tax matters partner (TMP) at the time of filing. Further, the person who held the largest partnership interest and who was qualified as the TMP did not file a petition within 90 days, and no other partner filed within the additional 60-day period of section 6226(b)(1). We have found jurisdiction in some cases where the appropriate individuals or partners ratify or authorize a petition executed by a person who may not have been the person authorized or contemplated by the statute. See, for example, *Chomp Associates v. Commissioner,* 91 T.C. 1069 (1988); *Montana Sapphire Associates v. Commissioner,* 95 T.C. 477 (1990).

In this case, however, the partners and TMP contend in the motion and briefs that they do not wish to ratify the act of filing or in any way adopt the prior petition. Additionally, they do not wish to file an amended pleading. Respondent, however, argues that the principle of *Kraasch v. Commissioner,* 70 T.C. 623 (1978), applies and contends that the partners impliedly ratified and authorized the promoter-partner's actions and that the partners should not now be allowed to deny that the petition was filed on their behalf.

This case presents a question of first impression. Although a similar principle has been recognized in cases involving notices of deficiency (in *Kraasch*), the application of such principles has not been addressed in the context of sections 6221 through 6233, the so-called "TEFRA partnership provisions" added to the Code by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 324, 648. If we find that implied ratification principles apply in TEFRA partnership cases, we must then decide if such ratification or authorization was present in this case. [3]

---

[1] The motion to dismiss was made by Edmond A. Malouf as a participating partner. Mr. Malouf at all pertinent times held the largest percentage interest in the partnership. At the time of the motion to dismiss, Mr. Malouf had not been expressly named or designated as the tax matters partner. After the filing of the motion, by Court order, he was named as the tax matters partner pursuant to his motion requesting that he be so designated.

[2] Unless otherwise indicated, section references are to the Internal Revenue Code.

[3] The movant (Mr. Malouf) argues on brief that respondent has the burden of proof on the

## Factual Background

Mishawaka Properties Co. (partnership or Mishawaka) is one of about 50 real estate partnerships created and promoted by Sol Finkelman (Finkelman), who was a certified public accountant. Although many of the partnerships date back to the midseventies, the taxable years involved in this case are 1983 and 1984. At all times relevant hereto, the partners of and their percentage interests in Mishawaka were as follows:

| | |
|---|---|
| Edmond A. Malouf (Malouf) | 35.6250 |
| Roger J. Mermod Trust, Richard H. Rasmussen, Trustee | 29.6875 |
| Emil and Claire Faris Trust, Emil and Clair Faris, Trustees | 11.8750 |
| Kishor S. Pathak | 11.8750 |
| Guy A. Biagiotti (Biagiotti) | 5.9375 |
| Finkelman | 4.0000 |
| Lawrence Finkelman | 1.0000 |
| Total | 100.0000 |

Mishawaka's only asset was a U.S. Postal Service building located in Mishawaka, Indiana.

Although there are conflicting views concerning whether Mishawaka is a general or limited partnership, the parties agree that for purposes of the motion to dismiss, it should be treated as a general partnership because it did not meet all the requirements of the California Uniform Limited Partnership Act.

Finkelman created and promoted commercial real estate partnerships, characterizing them as "tax oriented ventures". In each instance, Finkelman was the managing partner and was solely responsible for conducting partnership business. Respondent began to audit about 35 of the partnerships beginning in the late 1970s and for approximately the next 10 years, with the exception of litigation counsel retained by Finkelman, Finkelman was virtually the only partner or person who dealt with respondent's agents, Appeals officers, and

question of implied ratification because it was raised for the first time in respondent's objections to the motion to dismiss. We note that this motion on a procedural matter was submitted fully stipulated. In the setting of a motion where the facts have been fully stipulated, we consider the entire record and reach our ultimate findings based upon a preponderance of the evidence. Of course, we have considered the progression of the issue in sequence—in light of the movant's contention that the promoter-partner was unauthorized to file a petition as the tax matters partner, we considered whether the evidence supported respondent's argument that the filing of the petition had been ratified.

counsel concerning the partnerships and partnership proceedings. For years prior to 1983 (pre-TEFRA years), some partners were individually audited concerning the losses claimed in connection with the partnership, and many of them relied upon Finkelman for advice concerning both procedural and substantive questions involved in their audits.

As of May 1, 1985, Finkelman and respondent had settled tax disputes involving most of the partnerships with little or no change from the reported positions. However, disputes involving eight partnerships, including Mishawaka, were not settled. Pursuant to agreement between Finkelman and respondent, five of the partnerships' properties were selected to be the test cases and those cases were decided on February 16, 1989. *Finkelman v. Commissioner,* T.C. Memo. 1989-72, affd. without published opinion 937 F.2d 612 (9th Cir. 1991), cert. denied 503 U.S. ___, 112 S. Ct. 1291 (1992). Partners representing a majority of Mishawaka's partnership interests agreed, for tax years prior to 1983, to be bound by the final outcome of the above-cited case.

On April 14, 1988, triplicate notices of final partnership administrative adjustment (FPAA) for the 1983 and 1984 years were mailed by respondent to Finkelman, Malouf, and Mishawaka. The Finkelman and Malouf FPAA's were sent to the addressee as TMP. The third FPAA was sent to the partnership without naming a specific TMP. Triplicate original notices were sent pursuant to respondent's counsel's written opinion that there was doubt as to whether Mishawaka was a limited or general partnership and that all possible TMP's should be sent notice. On May 31, 1988, FPAA's were sent to each of Mishawaka's seven partners, including Finkelman and Malouf. On June 13, 1988, a petition signed by Finkelman was filed showing him as TMP. That petition was filed within the 90-day period described in section 6226(a).

Prior to mailing the FPAA's for 1983 and 1984, all correspondence between respondent and the partnership, regarding the audit examination, was with Finkelman on behalf of the partnership. Finkelman signed Mishawaka's partnership returns (Forms 1065) for 1979 through 1986. The 1983 and 1984 partnership returns were signed by Finkelman, without any specific designation, on behalf of the partnership in the jurat section and also as the return pre-

parer. The partnership returns reflected the partners as general partners, and Finkelman acted on their behalf as tax return preparer, accountant, and managing partner.

Concerning the disallowance of the claimed 1978 through 1982 losses from Mishawaka, respondent sent revenue agents' reports and statutory notices directly to Mishawaka's partners. After the effective date of the TEFRA partnership provisions, a new audit examination was unnecessary, as losses from the same transaction were being disallowed. For post-1982 tax years, respondent continued to deal with Finkelman, but did not send reports or documents other than the April 14, 1988, and May 31, 1988, FPAA's to individual partners other than Finkelman. After issuance of the May 31, 1988, FPAA, partners other than Finkelman did not receive any of the correspondence from respondent.

Beginning in 1978 and through September of 1991, the partners received various letters and copies of correspondence from Finkelman and from representatives of the partnership. The parties stipulated 44 such documents solely to show the state of mind of the senders and recipients and not for the truth of the contents of the documents. Twenty-one of the 44 were sent and/or received prior to issuance of the FPAA's under consideration. The earlier documents (through mid-1982) concerned various aspects of the partnership investment. After that time, the documents mainly concerned various aspects of the audit examination and controversy with respondent. Up until about 1987, most of the correspondence concerned the pre-TEFRA years (pre-1983) and the individual audits and petitions of each partner. The trial and briefing of the test cases were completed during the fall of 1987, and the correspondence concerning this TEFRA partnership began to increase about the same time. From the correspondence, it appears that Finkelman was handling the audit and controversy activity on behalf of the TEFRA partnerships and the partners.

By a July 6, 1988, letter, Finkelman advised Mishawaka's partners concerning the FPAA's as follows:

Most, if not all, of you have been receiving 90 day letters [sic] on one or more of the above partnerships from the IRS.

This is to advise you that as the Tax Matters Partner, I have answered every 90 day letter [sic] on behalf of the entire partnerships, for the years

1983 and 1984, as received. The Tax Court has acknowledged receiving the replies for the 90 day letters [sic]. You can rest assured that I will be answering any additional 90 day letters [sic] as they come in. As I understand the law, my answers on behalf of the partnership covers all partners therein. I trust that this information is sufficient for your needs. [Although the term "90 day letter" is used, FPAA's were issued by respondent.]

All partners received the above-quoted letter with the exception of Malouf, who does not recall whether or not he received the letter.

By letters dated November 8, 1989, from a real estate company each partner was advised of the sale of the Mishawaka Post Office and each of them received a check representing his partnership percentage interest of the net proceeds of $101,804.96. Meetings of Finkelman partnerships, including Mishawaka and its partners, were scheduled and held on November 17, 1986, and January 14, 1989. The meetings were attended by Finkelman, and the January 14, 1989, meeting was attended by all Mishawaka partners or representatives of same, with the exception of Biagiotti. The January 14, 1989, meeting concerned the litigation of the pre-TEFRA cases, whether the balloon debt on some of the properties should be paid off or whether the properties should be sold, and whether investors should "walk away from the buildings". At about that same time, Finkelman was advising partners that he could no longer finance the litigation and pursuit of the tax matters and that committees should be formed to help make decisions and organize partners, including their financing of future activity and litigation. During the appellate litigation, *Finkelman v. Commissioner*, 937 F.2d 612 (9th Cir. 1991), the attorneys handling the appeal wrote to the partners and proposed assessments based upon percentage ownership interests to pay the legal expenses of the appeal of the lower court opinion and decisions.

Mishawaka's partners never designated a TMP for any year in the manner set forth in section 301.6231(a)(7)-1T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6791 (Mar. 5, 1987). Additionally, respondent did not select a TMP under section 6231(a)(7) for any year. No partner of Mishawaka has filed or would presently be willing to file an amended petition ratifying the petition filed by Finkelman in this case. There is no evidence that a partnership agreement ever

existed, although some of the partners remember executing subscription agreements and an "Amendment to Joint Venture Agreement" document does exist. The amendment document, however, contains what appears to be a complete agreement and includes a description of the duties and rights of partners and the managing partner (Finkelman). Paragraph 7 of the amendment document, in pertinent part, recites the following:

(a) * * * The Managing Partner shall operate and manage and have the exclusive control over the Partnership's business and affairs, and the signature of the Managing Partner shall be the sole signature required to bind the Partnership on all documents of the Partnership. The Managing Partner is hereby granted all authority and power necessary to * * * borrow money * * * encumber * * * [or] sell * * * asset[s] * * *.

None of the partners, however, recollects whether he signed the amendment document.

Up until the filing of petitioner's motion to dismiss on February 14, 1992, no partner, other than Biagiotti, had taken any action to disavow, repudiate, or manifest any objection to Finkelman's filing of the petition in this case. Except for Biagiotti, as of August 1992, no partner had taken any action to terminate his involvement in this case by settling partnership items under sections 6224(c) and 6231(b)(1)(c) or in any other manner. Although some action was taken by Biagiotti, no partner had resolved his partnership items in this case. Some of the partners had relied upon Finkelman in connection with the filing of their petitions and other matters concerning respondent's Mishawaka partnership determinations for years prior to 1983. With the exception of one trust, each of the other Mishawaka partners owned an interest in at least one other "Finkelman partnership" which is also involved in a controversy with respondent.

Finkelman did not consult any attorney in connection with the filing of the petition in this case. Concerning Mishawaka's 1985 and 1988 tax years, on September 29, 1989, and July 9, 1990, petitions were filed by a law firm on Finkelman's behalf, as a "Partner Other than the Tax Matters Partner". Copies of those petitions were sent to each Mishawaka partner by the law firm and no partner raised any objection or took any action to disavow or repudiate the petitions or to terminate his involvement in this case. Currently, the whereabouts of Finkelman are unknown.

In connection with the preparation of this matter, respondent propounded questions of the partners and received some responses, as follows:

(1) When asked if they received a 1983-84 FPAA, one partner did not know, one did not answer, and the remainder responded affirmatively.

(2) When asked why they did not file a petition after receiving an FPAA, two partners did not answer, one partner sent his FPAA to his accountant (who was Finkelman's brother), two partners did not file because Finkelman had indicated that he had already filed, and one partner responded that Finkelman "was taking care of it".

(3) When asked if the reason they did not file a petition was because Finkelman had done so, two did not answer, three answered affirmatively, and one advised that he had sent the FPAA to his accountant. Partners holding a majority of the partnership interests answered affirmatively.

(4) When asked whether prior to the February 16, 1989, Tax Court opinion in *Finkelman v. Commissioner,* T.C. Memo. 1989-72, they desired to have the 1983 and 1984 Mishawaka adjustments disputed (litigated) in the Tax Court, partners with a majority of the partnership interests, including Malouf and Biagiotti, answered affirmatively.

(5) When asked whether prior to February 16, 1989, they believed that Finkelman "was, and desired that he be, responsible for pursuing litigation in the Tax Court with respect to Mishawaka", partners, including Malouf, with a majority of the partnership interests, answered affirmatively.

(6) When asked whether prior to February 16, 1989, they wanted Finkelman to file a petition and preserve their right to dispute the 1983 and 1984 determination, partners with a majority of the partnership interests, including Malouf and Biagiotti, answered affirmatively.

(7) When asked if they supported the appeal of the Tax Court case because success in the appeal would have, to some extent, resolved the 1983 and 1984 Mishawaka adjustments, partners with a majority of the partnership interests, including Malouf and Biagiotti, answered affirmatively.

(8) When asked whether they "never intended to be a general partner" in Mishawaka and/or intended to remain uninvolved in the management and conduct of the partnership,

partners with a majority of the partnership interests, including Malouf, answered affirmatively.

(9) Partners with a majority of the partnership interests, including Malouf, believed that the period for assessment with respect to Mishawaka's "1983 and 1984 [taxable years] expired 1 year and 150 days after April 14, 1988, or on or about September 11, 1989".

(10) Finally, partners with a majority of the partnership interests, including Malouf, would have opposed a motion to dismiss by respondent in order to facilitate assessment of tax deficiencies against the partners, if the partners were aware that the period for assessment was open.

## Discussion

The motion under consideration is predicated upon the partners' belief[4] that if the petition in this case was not filed by the TMP in accord with section 6226 and the case is dismissed for lack of jurisdiction, then the period for assessment expired 1 year and 150 days after the mailing of the FPAA because "no action was brought" sufficient to suspend the assessment period within the meaning of section 6229(d).[5] We are asked to decide whether we have jurisdiction.

Under section 6226(a) only the TMP may file a petition for readjustment of partnership items within the 90-day period following the issuance of an FPAA to the TMP. If the TMP does not file a petition within the 90-day period, any notice partner or 5-percent group may file a petition for readjustment of partnership items within 60 days after the close of the 90-day period in accordance with section 6226(b)(1).

The TMP of a partnership is defined in section 6231(a)(7) as follows:

---

[4] We note that the partners' position is, at best, opportunistic. If Mishawaka Properties Co. is a limited partnership, Finkelman would have been the TMP under sec. 6231(a)(7)(A) and sec. 301.6231(a)(7)-1T(m), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6792 (Mar. 5, 1987). This is so because Finkelman would have been the only general partner and qualified as the TMP. The parties have stipulated, however, that Mishawaka should be considered a general partnership for purposes of the motion under consideration.

[5] Respondent does not agree that the period for assessment would have expired, but there has been no indication regarding what the parties would do if we decided that we lack jurisdiction of this case. If we decided that we do not have jurisdiction, the parties would have several possible approaches available. We note that this matter is jurisdictional and preliminary to any consideration of the substantive issues raised by the adjustments in the FPAA. In any event, we have not been asked to and we do not address the question of the assessment period. Further, because we ultimately decide that we have jurisdiction, the question of the assessment period becomes moot.

(7) TAX MATTERS PARTNER.—The tax matters partner of any partnership is—

> (A) the general partner designated as the tax matters partner as provided in regulations, or
>
> (B) if there is no general partner who has been so designated, the general partner having the largest profits interest in the partnership at the close of the taxable year involved * * *

If there is no general partner designated under subparagraph (A) and the Secretary determines that it is impracticable to apply subparagraph (B), the partner selected by the Secretary shall be treated as the tax matters partner.

A petition filed during the 90-day period by a partner other than the TMP is an invalid petition. *Amesbury Apartments, Ltd. v. Commissioner,* 95 T.C. 227 (1990); *Computer Programs Lambda, Ltd. v. Commissioner,* 89 T.C. 198, 205 (1987). In this case, because the parties have agreed that Mishawaka is a general partnership, it would follow that Finkelman was not the TMP at the time of the filing of the petition. Normally, "This Court does not have jurisdiction to consider a petition filed by a person or entity not qualified by law." See *1983 Western Reserve Oil & Gas Co. v. Commissioner,* 95 T.C. 51, 62 (1990), and cases cited therein.

However, in a limited line of cases, we have permitted the perfection of "imperfect petitions". See *Holt v. Commissioner,* 67 T.C. 829 (1977); *Brooks v. Commissioner,* 63 T.C. 709 (1975); *Carstenson v. Commissioner,* 57 T.C. 542 (1972). Under the principle of ratification, an imperfect petition in a TEFRA proceeding has been perfected by the filing of an amended petition if there is evidence that a person qualified to file the petition authorized or consented to the filing of the petition by the improper party. *Montana Sapphire Associates v. Commissioner,* 95 T.C. 477 (1990). The underlying rationale of ratification cases tends to follow a pattern where: (1) The person who attempted to file the petition thought he was authorized, and (2) those who ratified were authorized to file or approve the filing of the petition, and (3) ratification was expressly attempted or possible. In those situations, we have held that—

We do not believe that it is appropriate to dismiss the petition under these circumstances without first giving (1) the partnership the opportunity to advise the Court of the name of a person to be appointed tax matters partner and (2) the tax matters partner the opportunity of ratifying the original petition. [*Id.* at 483.]

In this case, respondent mailed triplicate FPAA's, one each to Finkelman and Malouf, as TMP's, and one to the partnership without specifically naming a TMP. No argument was made that there was no notice or inadequate notice. Instead, the partners have argued that respondent, by sending triplicate notices, not only failed to designate a TMP under section 6231(a)(7), but also created the circumstances which they contend should result in a decision that the petition filed by Finkelman was invalid or ineffective. In other words, the partners argue that respondent's current predicament (possibility of a petition which did not confer jurisdiction) is self-inflicted. We do not find the FPAA's or the notice to the partner or partnership to be faulty or insufficient within the meaning of section 6223. Moreover, we find it appropriate for respondent to send multiple FPAA's where there is a legal question as to who would be TMP under the statute. The focus of this case, however, is on the validity of the petition and not upon the validity of the FPAA's.

This case has become unique because the partners are not seeking to invoke the jurisdiction of this Court as in prior cases. Instead, they seek refuge behind the fact that Finkelman may not have been TMP when the petition was filed. Although the partners, including the one qualified under the statute to be TMP, would have explicitly ratified the Finkelman petition if the period for assessment was open and respondent had sought to dismiss for lack of jurisdiction, the partners take the opposite tack because they believe the period for assessment is expired. Accordingly, the partners do not now wish to ratify, adopt, sanction, or in any way breathe life into the Finkelman petition. Respondent, on the other hand, contends that the partners' inactivity considering Finkelman's actions was an implied ratification of Finkelman's actions.

In this regard, respondent relies upon *Kraasch v. Commissioner,* 70 T.C. 623 (1978), which employed "implied ratification" principles in the setting of an income tax deficiency case. In that case, individual taxpayers had relied upon their accountant-tax consultant to handle all of their tax matters. Anything received by the taxpayers concerning their tax matters would be forwarded to the accountant. After the taxpayers had been summoned to appear with their records for audit, upon advice of their accountant, they appeared and

advised that they would only turn over records in court and would then "plead the Fourth and Fifth Amendments to the Constitution of the United States." *Id.* at 625. Thereafter, a petition executed by the accountant in the taxpayers' names was filed with this Court, but the accountant had signed the taxpayers' names to that petition. As in this case, after the expiration of the assessment period, the taxpayers moved to dismiss, claiming that they had not authorized or approved the accountant's acts in filing or signing a petition.

In *Kraasch,* we found that the accountant in filing the petition "acted as the authorized agent of * * * [the taxpayers]." We also found that "even if this were a situation where * * * [the accountant] acted upon * * * [the taxpayers'] behalf without authority, * * * [the taxpayers] are still bound * * * because they subsequently ratified * * * [the accountant's] actions." *Id.* at 627, 628. The ratification was implied because it was found to be based upon the taxpayers' conduct subsequent to the filing of the petition, even though they had not expressly approved or authorized the act of filing or signing their names to the petition. In reaching that conclusion, it was noted that the taxpayers were informed and knowledgeable about documents received from the Government and actions taken by the accountant.

The *Kraasch* rationale is rooted in concepts of agency and ratification. In that case the person who signed the taxpayers' names was representing their interests before the Internal Revenue Service and handling all of their tax matters. Even though the agent did not have specific authority to sign the taxpayers' names on a petition or to file a petition on their behalf, a petition was filed and the taxpayers were aware of it and they permitted it to represent their wishes.[6]

Under established case law in the State of California, "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him." See *Rakestraw v. Rodrigues,* 500 P.2d 1401, 1404-1405 (1972), and cases cited therein. Further, "A pur-

---

[6] Commentators generally recognize that an unauthorized act of a partner may bind the partnership if subsequently ratified and that the ratification may be implied by acquiescence, if co-partners learn of it and fail to repudiate it within a reasonable time. See, e.g., Reuschlein & Gregory, Law of Agency and Partnership, sec. 201, at 305 (2d ed. 1990).

ported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.'" *Id.* at 1405 (quoting *Ballard v. Nye,* 138 Cal. 588, 597, 72 P. 156, 159 (1903)).

The partners, however, argue that section 6231(a)(7)(A) implicitly requires more than implied authorization to designate a TMP and accordingly would prohibit implied ratification. Section 6231(a)(7)(A) merely states that the TMP may be the general partner designated as provided in the regulations. Section 301.6231(a)(7)-1T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6791 (Mar. 5, 1987), describes the procedures for designating the TMP. In this case, no TMP had been appointed or designated, in accord with either the statute or regulations. In the confines of the motion under consideration, section 6231(a)(7)(B) causes Malouf to be TMP because he was the general partner with the largest percentage partnership interest.[7]

We have found in prior cases that the TEFRA partnership statutes or regulations would not prohibit subsequent authorization or ratification. Said authorization or ratification was also found to take effect ab initio. As in *Kraasch,* the express authority of the unauthorized person petitioning the Court is implied by the actions and/or failure to act. The underlying concept of the implied ratification principle is to reach the same result where the person(s) with control over the authority allow others to exercise it without repudiation. That principle is no less appropriate or proper in the setting of sections 6226 and 6231 than in sections 6212 and 6213.

We hold that the principle of implied ratification may be applied in a TEFRA proceeding. We reach this conclusion after considering that: (1) Ratification is allowed where TEFRA partners wish to do so; (2) the principles of implied ratification apply in non-TEFRA cases as explained in *Kraasch;* (3) the TEFRA statutory provisions do not require a different result; (4) we find no reason to treat this procedural aspect

---

[7] There was, however, some question about whether Mishawaka was a general or limited partnership under California law. The parties have agreed only for purposes of deciding this motion that the partnership should be considered a general partnership.

concerning petitions differently in a TEFRA proceeding as opposed to other types of cases within our jurisdiction; and (5) California law is in concurrence with the principle of implied ratification, as expressed in *Kraasch.*

The facts in this case vary in a few ways from those in *Kraasch.* In this case we are dealing with an entity-level proceeding with multiple parties. Sec. 6226(c)(1). Also, Finkelman, as promoter and managing partner, filed a petition during the 90-day period as though he were the TMP. Other than those aspects, the facts here are parallel to those in *Kraasch.* We do not think that the differences between the two cases distinguish them. So long as those who ratified by implication had the authority to empower the person or agent who filed the petition, it should make no difference that we are dealing with multiple parties. Here, Malouf could have individually filed a petition within 90 days and partners with a majority of interests in Mishawaka could have designated Finkelman as TMP. Those individuals through their knowledge, actions, and inaction authorized Finkelman's petition under the principle of implied ratification. As discussed above, the TEFRA partnership statutory provisions do not preclude this result.

The Mishawaka partners, including Malouf, were aware that Finkelman had represented them before respondent, both individually and as a group (partnership). That representation had to do with all business and tax matters involving Mishawaka. In addition, the partners were aware of the 1983-84 FPAA's (determination of adjustments by respondent) and that Finkelman had filed a petition or was acting on their behalf in connection with respondent. We note that the 1983-84 tax years were but a continuation of an ongoing controversy with respondent which spanned about 10 years when the 1983-84 FPAA's were mailed.

Here, as in *Kraasch,* we find that the ratification was implied because it was based upon the partners' conduct subsequent to the filing of the petition, even though they had not expressly approved or authorized the act of filing or signing their names to the petition. We reach that conclusion based upon the factual circumstances outlined above. Having reached that conclusion, we also note that Finkelman's petition had been treated or accepted by both respondent and the partners as precluding respondent from assessing defi-

ciencies for any partner with respect to partnership items until the partnership proceeding became final or until an item otherwise became assessable.[8] In that regard, during the same period, the partners and respondent were engaged in the trial, post-trial briefing, and eventually the appeal of the test cases which would have been dispositive of the controversy generated by Mishawaka's 1983-84 FPAA's. Each of the Mishawaka partners had received an FPAA (either as a TMP or partner) and, other than Finkelman, none of the partners filed a petition.

In the case before us, respondent's argument is that Malouf, who was the TMP and was qualified to be TMP, impliedly ratified Finkelman's filing of the petition in the same manner as the taxpayers in *Kraasch*. We agree. Whether we find implied ratification by the partner who was qualified to be the TMP or by a majority of the partners who could have designated a TMP, the result would be the same. The partners, including Malouf (who would have been designated TMP under section 6231(a)(7)(B) if this was a general partnership), relied upon Finkelman, both before and after the filing of the petition under consideration and did not question his authority until the passage of several years and until it became advantageous to do so. The partners here voluntarily permitted Finkelman's petition and apparent authority to exist, a situation that should not redound to their own benefit and to respondent's detriment.

> *An order will be issued denying the motion to dismiss for lack of jurisdiction.*

---

[8] Respondent had sent triplicate FPAA's because of the legal possibility that Mishawaka was a limited partnership. It was both reasonable and appropriate for respondent to rely on Finkelman's petition and to consider it a choice by the partners or partnership either with respect to the status as a general or limited partnership or the proper person to file a petition under the statute.