T.C. Memo. 2001-6


UNITED STATES TAX COURT



TRANS WORLD TRAVEL, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12390-96.                    Filed January 17, 2001.


<u>Steven S. Brown</u> and <u>Daniel T. Hartnett</u>, for petitioner.

<u>Patricia Pierce Davis</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  This case was assigned to Special Trial Judge Robert N. Armen, Jr., pursuant to the provisions of section 7443A(b)(5) and Rules 180, 181, and 183.[1]  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

_____

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## OPINION OF THE SPECIAL TRIAL JUDGE

ARMEN, Special Trial Judge:  This matter is before the Court on petitioner's motion for leave to file a motion to vacate the stipulated decision of this Court entered on March 26, 1997. At issue is whether the Court lacked jurisdiction to enter the stipulated decision because petitioner neither authorized nor ratified the filing of the petition by its accountant.  As explained in detail below, we shall deny petitioner's motion for leave.

## FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  The stipulated facts and attached exhibits are incorporated herein by this reference.

Petitioner's sole office was located in Highland Park, Illinois, at the time that its petition was filed with the Court.

A. Trans World Travel, Inc.

Trans World Travel (petitioner) is a C corporation that was formed in 1966.  Since 1984, it has maintained a single office located at 734 Central Avenue, Highland Park, Illinois 60035 (the Highland Park office).

Petitioner is engaged in the group tour travel business. Its clientele consists of approximately 200 churches of different denominations located throughout the United States.

Petitioner's officers and shareholders are two brothers, James M. Gibbs (James) and John W. Gibbs (John). James and John each own 50 percent of petitioner's stock. James is petitioner's vice president and secretary, and John is petitioner's president and treasurer. James is primarily responsible for administrative, financial and tax matters, and his duties include running the office and dealing with the accountants. In contrast, John is primarily responsible for sales and promotion. James and John each attended college for 2 years.

Other than James and John, petitioner employs approximately 8 to 10 individuals. None of these individuals exercises any managerial responsibility; rather, these individuals perform only clerical and sales-related duties.

Both James and John spend much of their time traveling on business. John in particular spends between 30 to 50 percent of his time traveling, both domestically and internationally. Although James travels less frequently than John, some of his destinations are also outside of the United States.

B. Steven Jaffe and the Firm of Coleman, Joseph & Jaffe

Neither James nor John, nor any of petitioner's other employees, possessed any expertise in either accounting or Federal tax matters. Accordingly, from 1991 through 1998, petitioner retained the accounting and consulting firm of Coleman, Joseph & Jaffe (CJ&J) to provide both accounting and tax

services, specifically including the preparation of periodic financial statements and various tax returns.

Steven Jaffe (Jaffe) was one of the named partners of CJ&J. Jaffe is a graduate of the University of Illinois, where he earned a bachelor of science degree in communications and political science. Jaffe also attended DePaul University for 2 years, where he studied accounting. Jaffe is neither a certified public accountant nor a licensed public accountant, nor is he enrolled to practice before the Internal Revenue Service or admitted to practice before this Court.

From 1991 through July 1998, Jaffe was the CJ&J partner who was responsible for servicing the Trans World Travel account. Jaffe prepared periodic financial statements, as well as various tax returns, specifically including Federal corporate income tax returns (Forms 1120). Jaffe also represented petitioner before the Internal Revenue Service.[2]

Seymour Coleman (Coleman) was another of the named partners in CJ&J. Coleman is a graduate of the University of Illinois, where he earned a bachelor of science degree in accounting, and a graduate of DePaul University, where he earned a master of science degree in tax. Coleman is a certified public accountant; he is not admitted to practice before this Court. From 1991

---

[2] Jaffe also prepared individual income tax returns for James and John and represented them before the Internal Revenue Service.

through July 1998, Coleman devoted relatively little time to the Trans World Travel account.

James and John relied on CJ&J, and particularly on Jaffe, to handle all of petitioner's accounting and tax matters, and James and John had confidence that CJ&J, and particularly Jaffe, would do so in a professional, competent, and timely manner.

James and John placed a very high level of trust in Jaffe, and they also regarded him as their friend. James and John gave Jaffe full and unfettered access to petitioner's books and records, and they authorized him to contact directly the vice president of the financial institution with which petitioner banked.

Because of their trust in, and reliance on, Jaffe, neither James nor John paid close attention to petitioner's tax matters. Rather, James and John adopted a hands-off approach, essentially delegating responsibility for petitioner's tax matters to Jaffe. Both James and John frequently signed, without scrutiny or inquiry, tax-related documents that were presented to them by Jaffe for their signature.

C. Petitioner's Office Procedures Related to Mail

Mail addressed to petitioner at its Highland Park office was received and sorted by petitioner's receptionists. Mail routed to John was opened and read by him. Tax-related mail was routed to James' office, where it was placed in a box reserved for

Jaffe's use.  Such mail was, on occasion, opened by James; generally, however, it was left unopened until it was picked up by Jaffe, who regularly visited petitioner's office, often as frequently as two or three times per week.  Any legal mail that might be received was routed to James and opened by him.

D. The IRS Examination

In 1991, respondent commenced an examination of one of petitioner's corporate income tax returns.  The examination was subsequently expanded to specifically include petitioner's income tax returns for the fiscal years ended August 31, 1990 through 1993.

Jaffe represented petitioner during the course of the IRS examination, with some participation by Coleman.[3]  Although James was aware of the examination, he did not participate in it, other than to attend the brief, initial meeting between Jaffe and the revenue agent in 1991 and to execute the written protest to the agent's report, see infra, that was prepared by CJ&J and submitted to IRS Appeals Office in October 1994.

---

[3]  The record in this case includes a copy of a Power of Attorney and Declaration of Representative (Form 2848) naming Jaffe and Coleman as petitioner's representatives.  This document, which was executed by James in Oct. 1993, is limited to the fiscal years ended Aug. 31, 1991 through 1993.  We are satisfied, however, that petitioner also named Jaffe and Coleman as its representatives for the fiscal year ended Aug. 31, 1990, as well as for the initial year of the examination.

In 1993, Jaffe complained to James about the revenue agent. In or about 1994 or 1995, Jaffe told James that the examination had been resolved and that petitioner would be liable for additional taxes; Jaffe also told James that any amounts paid by petitioner would be refunded by the IRS or reimbursed by CJ&J. James apparently accepted these statements at face value and did not question Jaffe about them.

John was also aware of the examination of petitioner's income tax returns. John would periodically ask Jaffe, typically at a social occasion such as during a round of golf, how the examination was going. Jaffe would assure him that there was nothing to worry about, and John would not inquire further.

In October 1994, CJ&J filed a protest on petitioner's behalf with the Internal Revenue Service. The protest served to administratively appeal the determination of the revenue agent as set forth in his report. The taxable years covered by the protest were the fiscal years ended August 31, 1990 through 1993. The protest was signed first by Coleman and then by James under penalties of perjury.

In or about 1995, Jaffe and Coleman met with an IRS Appeals Officer in Milwaukee to discuss petitioner's protest of the revenue agent's report.

E. The Tax Court Proceeding

On March 15, 1996, respondent's Milwaukee Appeals Office mailed a notice of deficiency to petitioner. The notice was addressed to petitioner at its Highland Park office. The notice determined deficiencies in petitioner's Federal income taxes and accuracy-related penalties under section 6662(c) as follows:

| Year | Deficiency | Accuracy-related Penalty I.R.C. Sec. 6662 |
|------|------------|-------------------------------------------|
| 1990 | $66,194    | $53,620                                   |
| 1992 | 129,526    | 25,905                                    |
| 1993 | 96,884     | 22,048                                    |

On June 14, 1996, a petition was filed with this Court disputing the deficiencies and penalties determined by respondent in the notice of deficiency. The petition was purportedly signed by John in his capacity as petitioner's president. However, the petition was actually signed by Jaffe. Jaffe had not been expressly authorized by John to sign John's name on the petition.

On June 17, 1996, the Court sent petitioner a Notification of Receipt of Petition (notification). The notification was mailed to petitioner at its Highland Park office. The notification served to confirm the receipt of a petition, its filing date, and the payment of the filing fee. The notification also disclosed the docket number that had been assigned by the Court to the petition. Finally, the notification advised that a

designation of place of trial had not been received.[4]  See Rule 140.

On June 25, 1996, the Court received and filed a Designation of Place of Trial (DPT), a simple, one-page document that designated Chicago, Illinois, as the place of trial.  The DPT was signed and dated by James.[5]  The Court served the DPT on petitioner at its Highland Park office in order to confirm the receipt and filing of the document.

On July 9, 1996, respondent served his answer to the petition, see Rule 36, by mailing a copy to petitioner at its Highland Park office.  The envelope containing the answer was delivered to petitioner and opened by James.  James printed "Attn: Steve Jaffe" in the upper right corner of the answer and placed it in the box in his office reserved for Jaffe's use.

On October 17, 1996, the Court sent petitioner a Notice Setting Case For Trial (the trial notice).  The trial notice was mailed to petitioner at its Highland Park office by certified mail.  The trial notice served to notify petitioner that its Tax Court case had been calendared for trial at the Trial Session

---

[4]  Consistent with its regular practice, the Court enclosed with the notification, for petitioner's use, the form designed to designate a place of trial.  See Form 5 in Appendix I to the Tax Court Rules of Practice and Procedure.

[5]  It was Jaffe, however, and not James who printed "Chicago, Illinois" on the DPT and added "Vice President" immediately to the right of James' signature.

beginning on March 17, 1997, in Chicago, Illinois.

In October 1996, at or about the time that the trial notice was sent to petitioner, Jaffe and Coleman met with respondent's District Counsel attorney in Chicago to discuss the issues raised by the notice of deficiency.

On March 12, 1997, shortly before the scheduled trial session, John signed and dated a stipulated decision. The stipulated decision reflected a complete concession of the deficiencies and penalties determined by respondent in the notice of deficiency. The Court entered the stipulated decision on March 26, 1997, and so notified petitioner by mailing a conformed copy on that date to petitioner at its Highland Park office.

F. Post-Decision Developments

In July 1998, CJ&J terminated Jaffe's status as a partner in the firm.

In August 1998, CJ&J[6] commenced a civil action against Jaffe in the Circuit Court for Cook County, Illinois. The complaint included counts for fraud, embezzlement, and forgery. This action was apparently still pending at the time of the evidentiary hearing in the present case.

In or about July or August 1998, petitioner retained an attorney for the purpose of addressing its tax liabilities for fiscal years for which Jaffe, as well as Coleman and CJ&J, had

---

[6] Actually, the successor firm to CJ&J.

provided representation.  In December 1998, the attorney filed an application with the IRS for audit reconsideration of the 3 taxable years that were the subject of the Tax Court proceeding and the stipulated decision entered on March 26, 1997.  In September 1999, the attorney was advised by representatives of the IRS District Director's Office in Chicago, Illinois, that audit reconsideration could not be granted.

On February 14, 2000, petitioner filed its Motion For Leave To File Petitioner's Motion To Vacate in respect of the stipulated decision entered on March 26, 1997, and lodged its Motion to Vacate.

In March 2000, petitioner, James, and John filed a civil action against (inter alia) Jaffe, Coleman, and CJ&J (see supra note 6) in the circuit court for Lake County, Illinois.  The complaint includes counts for breach of contract, breach of fiduciary duty, and malpractice.  The complaint's "Statement of Facts" includes the following allegations:

> On March 13 [sic], 1996, the IRS sent Trans World a notice of deficiency of income tax for tax years ended August 31, 1990, August 31, 1992, and August 31, 1993, claiming an increase in tax to be paid by Trans World for such years of $292,604.00 and penalties of $101,573.00, a copy of which notice is attached hereto as Exhibit A.
>
> Upon Plaintiffs' receipt of Exhibit A they immediately gave the same to Jaffe who advised them that the notice was not a problem and that the Audit would eventually be resolved in Plaintiffs' favor. [Emphasis added.]

This action was still pending at the time of the evidentiary hearing in the present case.

OPINION

The question presented is whether grounds exist in this case for vacating what is otherwise a final decision.  As explained in greater detail below, we shall deny petitioner's Motion For Leave To File Petitioner's Motion to Vacate Decision.

The decision in this case was entered on March 26, 1997. See sec. 7459(c).  A decision of this Court becomes final upon expiration of the time to file a notice of appeal with respect to such decision.  See sec. 7481(a)(1).  Generally, a notice of appeal must be filed within 90 days after the decision is entered by this Court.  See sec. 7483; Fed. R. App. P. 13(a).  The 90-day appeal period may be extended with the timely filing of a motion to vacate or revise the decision.  See Fed. R. App. P. 13(a). Absent special leave of the Court, such a motion must be filed within 30 days after the decision has been entered.  See Rule 162.  The disposition of a motion for leave to file a motion to vacate or revise a decision lies within the sound discretion of the Court.  See Heim v. Commissioner, 872 F.2d 245, 246 (8th Cir. 1989), affg. T.C. Memo. 1987-1.

In the present case, petitioner did not file a notice of appeal or a timely motion to vacate or revise the decision entered on March 26, 1997.  Thus, the decision became final on

Tuesday, June 24, 1997, 90 days after the decision was entered. See sec. 7481(a)(1).

Once a decision of this Court becomes final, we may vacate the decision only in certain narrowly circumscribed situations. See <u>Helvering v. Northern Coal Co.</u>, 293 U.S. 191 (1934); <u>Drobny v. Commissioner</u>, 113 F.3d 670, 677 (7th Cir. 1997), affg. T.C. Memo. 1995-209; <u>Curtis v. Commissioner</u>, T.C. Memo. 1996-371. The Court of Appeals for the Seventh Circuit, the court to which this case is appealable, has held that the Tax Court lacks general equitable powers, and, therefore, lacks the authority to vacate or revise an otherwise final decision on grounds such as "mistake, newly discovered evidence, and the like." <u>Kenner v. Commissioner</u>, 387 F.2d 689, 690 (7th Cir. 1968). Indeed, the Court of Appeals has recently stated that "this circuit has continued to recognize only a single, narrow exception to the general rule of finality prescribed by Congress in 26 U.S.C. §7481", namely, that the decision resulted from fraud on the court. <u>Drobny v. Commissioner</u>, <u>supra</u>.

Other courts have ruled that this Court may vacate a final decision if that decision is shown to be void, or a legal nullity, for lack of jurisdiction over either the subject matter or the party, see <u>Billingsley v. Commissioner</u>, 868 F.2d 1081 (9th Cir. 1989); <u>Abeles v. Commissioner</u>, 90 T.C. 103, 105-106 (1988); <u>Brannon's of Shawnee, Inc. v. Commissioner</u>, 71 T.C. 108, 111-112

(1978); or if the decision was obtained through fraud on the Court, see Abatti v. Commissioner, 859 F.2d 115 (9th Cir. 1988), affg. 86 T.C. 1319 (1986); Senate Realty Corp. v. Commissioner, 511 F.2d 929, 931 (2d Cir. 1975); Stickler v. Commissioner, 464 F.2d 368, 370 (3d Cir. 1972); Casey v. Commissioner, T.C. Memo. 1992-672. In addition, some courts have indicated that the Tax Court has the power in its discretion, in extraordinary circumstances, to vacate and correct a final decision where it is based on a mutual mistake of fact. See LaFloridienne J. Buttgenbach & Co. v. Commissioner, 63 F.2d 630 (5th Cir. 1933).[7]

In the present case, petitioner contends that the decision entered on March 26, 1997, is a legal nullity and is therefore not final, because the Tax Court lacked jurisdiction over petitioner. In support of its contention, petitioner cites and relies on Billingsley v. Commissioner, supra; Abeles v. Commissioner, supra; and Brannon's of Shawnee, Inc. v. Commissioner, supra. Notably, petitioner does not contend that fraud on the court was committed and provides an exception to the general rule of finality.

---

[7] Although the U.S. Court of Appeals for the Sixth Circuit cited mutual mistake of fact as a grounds for vacating a final decision of this Court in Reo Motors, Inc. v. Commissioner, 219 F.2d 610 (6th Cir. 1955), that Court of Appeals more recently concluded that Reo Motors, Inc. was effectively overruled by virtue of the Supreme Court's affirmance of Lasky v. Commissioner, 235 F.2d 97 (9th Cir. 1956), affd. per curiam 352 U.S. 1027 (1957). See Harbold v. Commissioner, 51 F.3d 618, 621-622 (6th Cir. 1995).

If we were to construe literally the statement of the Court of Appeals that fraud on the court is the only exception to the general rule of finality in the Seventh Circuit, then we could dispose of petitioner's motion for leave in short order. After all, petitioner has not alleged, much less demonstrated, any fraud on the court. However, the statement of the Court of Appeals was made in the context of the Tax Court's lack of general equitable powers, and one might question whether vacating an otherwise final decision for lack of jurisdiction is equivalent to vacating such a decision on grounds such as "mistake, newly discovered evidence, and the like." Kenner v. Commissioner, supra.

In the present case, the parties have proceeded as if lack of jurisdiction is an exception to the general rule of finality in the Seventh Circuit. Because such an approach is not flatly inconsistent with Drobny v. Commissioner, supra, we have chosen to address petitioner's contentions on their merits.

Petitioner contends that this Court lacks jurisdiction to bind petitioner because the petition was filed without proper authorization from petitioner. See Hoj v. Commissioner, 26 T.C. 1074 (1956). Whether the filing of the petition was authorized or later ratified by petitioner is a question of fact to be determined based on principles of the law of agency, as applicable under Illinois law. See Mishawaka Properties Co., 100

T.C. 353, 363-367 (1993); Adams v. Commissioner, 85 T.C. 359, 369-372 (1985); Kraasch v. Commissioner, 70 T.C. 623, 627-629 (1978); John Arnold Executrak Sys., Inc. v. Commissioner, T.C. Memo. 1990-6.  Petitioner bears the burden of proof.  See Kenner v. Commissioner, supra at 691; Kraasch v. Commissioner, supra at 626.

A. Jaffe's Authority To File a Tax Court Petition

Under the common law of agency, authority may be granted by an express statement or may be derived from implication of the principal's words or deeds.  See John Arnold Executrak Sys., Inc. v. Commissioner, supra (citing Restatement, Agency 2d, sec. 26 (1957)).  Therefore, it is the principal who is the source of the agent's power, and the agent's authority is traced back to the word or act of the principal.  See Yugoslav-Am. Cultural Ctr. v. Parkway Bank and & Co., 289 Ill. App. 3d 728 (1997).  Moreover, the scope of an agent's authority is evaluated in an objective manner, taking into consideration what a reasonable person in the agent's position would conclude that the principal intended, regardless of whether that is what the principal actually intended.  See John Arnold Executrak Sys., Inc. v. Commissioner, supra (citing Restatement, supra).

In order to bind the principal, the agent must either have actual or apparent authority, or the principal must ratify the agent's acts.  Authority is examined taking into account all the

circumstances, including the relationship of the parties, the common business practices, the nature of the subject matter, and the facts of which the agent has notice concerning objects the principal desires to accomplish. See id. (citing Restatement, supra sec. 34).

The existence and scope of an agency relationship are questions of fact, unless the relationship is so clear as to be undisputed. See Anetsberger v. Metropolitan Life Ins. Co., 14 F. 3d 1226, 1234 (7th Cir. 1994). As the trier of fact, "it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe." Kropp v. Commissioner, T.C. Memo. 2000-148; cf. Diaz v. Commissioner, 58 T.C. 560, 564 (1972).

Petitioner first contends that the Court lacked jurisdiction to enter the stipulated decision because petitioner never authorized Jaffe to file a petition on its behalf. We disagree. In our view, the record demonstrates that Jaffe acted as petitioner's authorized agent in filing the petition and that Jaffe acted within the general scope of his employment when he signed the petition. In this regard, two prior cases of this Court are particularly instructive. See Kraasch v. Commissioner, supra; Shopsin v. Commissioner, T.C. Memo. 1984-151, affd. without published opinion 751 F.2d 371 (2d Cir. 1984).

In Kraasch v. Commissioner, supra, a petition was filed and

signed in the taxpayers' names by the taxpayers' accountant and tax consultant, an individual who was neither an attorney nor admitted to practice before this Court. The Commissioner filed a motion to dismiss for failure to state a claim upon which relief could be granted. After the taxpayers failed to file a proper amended petition, the Court entered an order of dismissal and decision. Thereafter, the taxpayers filed a motion to modify the order, alleging that the Court lacked jurisdiction because the taxpayers neither signed the petition nor authorized anyone to file a petition on their behalf.

After an evidentiary hearing, the Court found that the taxpayers' accountant had acted within the scope of his employment when he filed the petition and signed it in the taxpayers' names. Among the facts and circumstances that the Court found particularly relevant in reaching its conclusion were the following: The taxpayers permitted their accountant to handle their tax affairs generally, and they had knowledge that he did so; over a period of years, the taxpayers routinely forwarded any tax information that they received to their accountant and relied on him to handle such material; and the conduct of petitioners' accountant and tax consultant, in signing and filing the petition, was of the same general nature as, or incident to, that which he was employed to perform.

In Shopsin v. Commissioner, supra, a petition was filed and

signed in the taxpayers' names by the taxpayers' accountant and bookkeeper, an individual who was neither an attorney nor admitted to practice before this Court.  There was no evidence that the taxpayers ever saw the contents of the petition.  In any event, after it was filed, the accountant engaged in negotiations with the Commissioner's Appeals Office and was successful in reaching a settlement that reduced the deficiency.  A stipulated decision was signed by the taxpayers and the Commissioner and then entered by the Court.  Thereafter, petitioners filed a motion to vacate the decision on the ground that the taxpayers neither authorized nor ratified the filing of the petition on their behalf by their accountant.

After an evidentiary hearing, the Court found that the taxpayers' accountant had acted within the general scope of his employment in signing the petition and as petitioners' authorized agent in filing the petition.  In so finding, the Court stated as follows:

> It is clear from the record in this case that petitioners routinely and without question placed their tax affairs in the hands of Levy [petitioners' accountant].  Time and again at the hearing petitioners testified that, when they received tax-related documents, their practice was to forward them to Levy or telephone Levy for his instructions with respect to what to do with the documents.  Further, petitioners invariably deferred to Levy's judgment, signing without necessarily reading, or certainly understanding, whatever document Levy advised that they sign.  In other words, petitioners permitted Levy to handle their tax affairs generally and knew that he did so.  In essence, Levy was petitioners' general agent authorized

> to perform on a continuing basis all necessary acts with respect to petitioners' tax affairs. Levy's conduct in filing the petition was of the same general nature as, and incident to, those functions that he was employed to perform. [Id.]

In the present case, the record clearly demonstrates that neither James nor John, nor any of petitioner's other employees, possessed any expertise in Federal tax matters and that, as a consequence, James and John retained, and relied on for a period of 7 or 8 years, CJ&J, and particularly Jaffe, to provide tax services, including the representation of petitioner before the Internal Revenue Service. The record also clearly demonstrates that James and John trusted Jaffe and had confidence in him. Indeed, they regarded Jaffe as their friend, and they gave him full and unfettered access to petitioner's books and records; Jaffe was even authorized to deal directly with the vice president of petitioner's bank.

Because James and John trusted and relied on Jaffe, neither brother paid close attention to petitioner's tax matters. Rather, they adopted a hands-off approach and essentially delegated responsibility for petitioner's tax matters to Jaffe. They also instituted, or acquiesced in, an office procedure whereby tax-related mail was routed to James' office, where it was placed, generally unopened and unread by James, in a box reserved for Jaffe's use. They also frequently signed, without scrutiny or inquiry, tax-related documents that were presented to

them by Jaffe for their signature.

The lack of involvement by James and John in the tax affairs of their corporation, and the degree to which James and John relied on Jaffe to handle those affairs, is aptly demonstrated by the following colloquies between counsel and John and then James:

PETITIONER'S COUNSEL:  And why would you sign these documents?

JOHN GIBBS:  I just totally trusted Steve.  I would sign the papers, he'd put them down.  I wouldn't look at them.

*   *   *   *   *   *   *

PETITIONER'S COUNSEL:  Before July '98, did you ever execute any tax document, returns, or financial statements for Trans World at the direction of Jaffe?

JAMES GIBBS:  Yes, I did.

PETITIONER'S COUNSEL:  Would you review these documents?

JAMES GIBBS:  No.  Basically, again, he would just present them to me for my signature.

PETITIONER'S COUNSEL:  Now why would you just execute documents?

JAMES GIBBS:  One, again, he was a friend.  We trusted him.  And for the most part, I wouldn't have understood the documents that are given to me pertaining to the taxes.

*   *   *   *   *   *   *

RESPONDENT'S COUNSEL:  Did you ask Steve Jaffe what this document [the designation of place of trial] was?

JAMES GIBBS:  No, I did not.

RESPONDENT'S COUNSEL:  You didn't ask him what it

meant?

JAMES GIBBS: I didn't read it as I didn't ask him. No.

RESPONDENT'S COUNSEL: You didn't even read the part under your signature that says, Signature of Petitioner or Counsel?

JAMES GIBBS: I'm sorry. I didn't.

* * * * * * *

RESPONDENT'S COUNSEL: The fact is you didn't pay close attention to your tax matters, did you, sir?

JAMES GIBBS: No, I relied on Steve Jaffe.

In sum, James and John abdicated their responsibility as petitioner's sole corporate officers and shareholders for making any tax-related decisions for petitioner and instead placed that responsibility squarely on Jaffe. The message from James and John was clear: "We are not interested in tax matters." The mandate to Jaffe was equally clear: "You handle those matters for us."

Petitioner argues that neither James nor John was knowledgeable about tax matters and that neither would have understood what they were signing even if they had bothered to read the particular document that was presented for their signature. Petitioner apparently thinks that corporate officers have no duty to read any document before signing it, nor any duty to educate themselves about matters of consequence to the corporation, nor even any duty to ask fundamental questions about

actions being taken by their agents.  We categorically reject any such view.  See <u>Shopsin v. Commissioner</u>, T.C. Memo. 1984-151, wherein we stated:

> Had petitioners attempted to ascertain the precise status of their case at any particular point in time, we believe petitioners had the wherewithal to do so. Petitioners cannot avoid their responsibility on the basis of their failure to press the matter.

See also <u>Kraasch v. Commissioner</u>, 70 T.C. at 627-628, wherein we stated: "That * * * [the taxpayers] might not have understood the contents or chose at times not to read their mail before sending it to * * * [their accountant] in no way absolves them of responsibility or knowledge in this matter."

Petitioner also argues that Jaffe made it difficult for James and John to appreciate what they were signing because he typically presented them with a stack of documents, pointed to where they were expected to sign, and stood over them while they signed each document.  However, any suggestion of undue influence is belied by the following colloquy between the Court and James:

> THE COURT:  * * * Now, you said that Steve Jaffe typically would present you with documents to sign and basically say, Sign here.
>
> JAMES GIBBS:  That's correct.
>
> THE COURT:  If you had expressed an interest in a document, would he have precluded you from examining it?
>
> JAMES GIBBS:  I don't think so.
>
> THE COURT:  Did you feel free to examine the document should you have so chosen to do so?

JAMES GIBBS:  I would say yes.

The truth of the matter is that James and John simply had no interest in what they were signing when it came to tax-related matters.  For all intents and purposes, they had even delegated their signature authority to Jaffe.

B. Ratification

If, on the other hand, Jaffe acted without authority in signing and filing the petition, petitioner contends that the Court lacked jurisdiction to enter the stipulated decision because petitioner never ratified such unauthorized act.  Again, we disagree.

A finding of ratification under Illinois agency law is a complex, fact-intensive inquiry.  A wholly unauthorized act may nevertheless be made valid by a subsequent ratification, in that such subsequent assent would confirm what was originally an unauthorized and illegal act.  See Hefner v. Vandolah, 62 Ill. 483, 485 (1872); see also Middle W. Tel. Co. v. U.S. Fire Ins. Co., 296 Ill. App. 260, 265 (1938).  As applicable herein, ratification means retroactive adoption of an unauthorized signature by the person whose name is signed.

Ratification may be found from express statements or it may be inferred from the surrounding circumstances, for example, where the principal takes a position inconsistent with nonaffirmation of the transaction, see Hofner v. Glenn Ingram &

Co., 140 Ill. App. 3d 874, 883 (1st Dist. 1985), or fails to repudiate the agent's acts, see Chalet Ford, Inc. v. Red Top Parking, Inc., 62 Ill. App. 3d 270 (1st Dist. 1978), or retains the benefits of the unauthorized transaction, see Stathis v. Geldermann, Inc., 295 Ill. App. 3d 844, 858 (1998); George F. Mueller & Sons, Inc. v. Northern Ill. Gas Co., 12 Ill. App.3d 362 (1st Dist. 1973). In contrast, ratification will not be implied from acts or conduct that clearly evidences an intent not to ratify. See Evanston Bank v. Conticommodity Servs., Inc., 623 F. Supp. 1014, 1037 (N.D. Ill. 1985).

Our analysis continues with the specific circumstances that support our conclusion that petitioner ratified the filing of the petition by Jaffe on its behalf.

Although not familiar with tax procedure, James and John were aware, or should have been aware, that petitioner's case was before the Tax Court. Evidence of this is found from various events that occurred after the filing of the petition.

First, the Designation of Place of Trial (DPT) was mailed to petitioner at its Highland Park office by the Court. More importantly, James admitted that he signed and dated the DPT.

James testified that he did not review the DPT before signing it, but that if he had noticed it was a Tax Court document, he would have questioned Jaffe about it. We do not find this testimony particularly convincing, however, given the

fact that the DPT is a simple, one-page document, with the words

UNITED STATES TAX COURT
WASHINGTON, D.C. 20217

prominently displayed in capital letters at the very top of the page. Surely, too, even a cursory glance at the document's heading, "DESIGNATION OF PLACE OF TRIAL" only a few lines above the signature line, would have revealed the document's nature and origin. Moreover, immediately below the signature line and immediately above the "Dated" line was the preprinted designation: "Signature of Petitioner or Counsel". This should have alerted James to the fact that he was signing a document related to a legal proceeding.

Thus, at this early juncture, James either knew or should have known that a petition had been filed in the Tax Court. See Kraasch v. Commissioner, supra at 628, concluding that ratification occurred where the taxpayers "had, or reasonably should have had, knowledge of the material facts of the case at all times." Moreover, James' act in signing the Designation of Place of Trial constituted a ratification of Jaffe's prior act in filing the petition in the first instance.

Second, when petitioner received respondent's answer to the petition, petitioner either knew, or reasonably should have known, that it had a case pending before this Court. See id. In fact, James opened the envelope containing the copy of respondent's answer and wrote "Attn: Steve Jaffe" in the upper

right corner of the document, immediately opposite "UNITED STATES TAX COURT" and immediately above "Docket No. 12390-96". At trial, James admitted that he bears responsibility for reading his mail. He also bears responsibility for reading his mail with reasonable care. By placing respondent's answer in the box in his office reserved for Jaffe's use, James obviously knew that the document was tax related. At the very least, James saw, or should have seen, the Tax Court designation and knew, or should have known, that the case had escalated beyond the audit phase. See id. James' act of opening the envelope, annotating respondent's answer, and then forwarding it to Jaffe constituted a ratification of the filing of the petition.

Third, John signed and dated the stipulated decision. The decision is a relatively straightforward, two-page document that sets forth the amount of the tax deficiencies and accuracy-related penalties for which petitioner is liable. The words "UNITED STATES TAX COURT" appear prominently at the top of the first page, followed by the caption and docket number, which together clearly indicate that the document pertains to a court case. Immediately below the signature line on the second page of the decision was the typewritten designation:

> JOHN W. GIBBS, PRESIDENT
> TRANS WORLD TRAVEL
> Petitioner

which also indicated that the document pertained to a court case.

Thus, John either knew or should have known that he was concluding a case that was in litigation. See <u>id.</u> By signing and dating the stipulated decision, without even asking for clarification about the nature of the document, John ratified the filing of the petition. See, e.g., <u>Chalet Ford, Inc. v. Red Top Parking, Inc.</u>, <u>supra</u>.

C. <u>Conclusion</u>

In summary, we hold that petitioner failed to satisfy its burden of proving that the filing of the petition by Jaffe was unauthorized. We also hold that, in any event, subsequent conduct by James and John ratified Jaffe's action in filing the petition. Accordingly, the Court had jurisdiction, and it properly entered the stipulated decision on March 26, 1997.

In order to give effect to our holdings,

<u>An appropriate order denying petitioner's motion for leave to file a motion to vacate will be issued</u>.